Laramore, Judge,
delivered tbe opinion of tbe court:
Tbe claim here is for the disability retirement pay of an Army officer. Plaintiff bases bis claim on tbe alleged arbitrary and capricious action of tbe Army Board for the Correction of Military Records in denying plaintiff a reexamination and hearings and tbe resulting eligibility for retirement pay.
The history of plaintiff’s military service, injuries and consequences thereof, are fully set forth in tbe findings of fact and are briefly as follows:
*447 Plaintiff entered on active duty as an Infantry Officer in 1941, after four years of training in the ROTO at Cornell University.
In November of 1944 plaintiff was wounded in the battle for Metz. His wound was caused by a piece of heavy mortar which penetrated his forearm, coming out the other side. As a result thereof, plaintiff suffered a compound, com-minuted fracture of the navicular bone (the scaphoid bone of the wrist), the radius (the bone on the outer or thumb side of the forearm), and the ulna (the inner and larger bone of the forearm on the side opposite that of the thumb). The shell which penetrated plaintiff’s forearm and wrist, in addition to fracturing the aforesaid bones, damaged tendons, ruptured the radial artery, and injured the radial nerve.
Plaintiff was hospitalized in England and in the United States from November 1944 to April 1945, when he was found by a disposition board to have become disqualified for general duty and fit only for limited duty. The disposition board at that time told plaintiff that he was disabled for active or general service but that there was a possibility of improvement. Consequently he was placed on temporary limited duty for a period of six months. During this period of limited duty plaintiff did nothing that required any strenuous use of his arm.
In November 1945 a disposition board found that plaintiff’s disability was permanent and he was placed in a status of permanent, rather than temporary, limited duty. He was then given the choice of continuing in a permanent lim ited duty status or appearing before a retiring board. In May 1946, upon completing the course of teaching to which he had been assigned, he was sent to Halloran General Hospital for appearance before a disposition board and Army retiring board.
The disposition board diagnosed plaintiff’s condition as follows:
Deformity of right hand, moderate, manifested by 25% loss of wrist flexion and extension and moderate sensory changes on palmar surface of right wrist and thumb, secondary to FCC, navicular, right, and FCC, radius and ulna, right, accidentally incurred when patient was *448 wounded in action by enemy shrapnel on 17 Nov 44 near Hallstroff, France. LOD: Yes
Plaintiff was given a physical examination on July 18, 1946, which disclosed in part as follows:
(88) — Well healed incisional scar 1" x 1", palmar aspect, right wrist. Slight depressed scar, lateral aspect, right wrist.
(40) — Moderate loss of grip on right as compared with left. Loss of 25% in extension & flexion of rt. wrist. 10° loss of radial & ulnar deviation, rt. wrist; absent radial pulse, right.
(55) — Deformity of right hand, moderate, manifested by 25% loss of wrist flexion & extension and moderate sensory changes on palmar surface of right wrist and thumb, secondary to FCC, navicular, right, and FCC, radius & ulna, right, accidentally incurred when patient was wounded in action by enemy shrapnel on 17 Nov 44 near Hallstroff, France.
A recommendation was made that plaintiff be placed on temporary limited duty for six months with re-evaluation at the expiration of that time.
On July 19, 1946, plaintiff appeared before an Army retiring board at the Halloran General Hospital. As a result said board found that “Lieutenant Colonel Stanley Weiner is not permanent [sic] incapacitated for active service at this time.” The board then recommended:
This officer be considered for a temporary limited service status for a period of six months with reexamination and reevaluation as to physical fitness at the end of that time.
The president of the board then advised plaintiff further as follows:
You are informed that final action in your case will be taken by the War Department and you will be notified of such action by the Adjutant General of the Army.
You also are informed that it is the policy of the War Department not to recall an officer to active duty without his consent while that officer is on terminal leave or after the expiration of his terminal leave.
If an officer is recommended for reexamination at the expiration of a stated period the War Department will authorize his admission to the Army hospital for the *449 purpose of such reexamination while he is on an inactive status.
You also will be given certain information concerning the steps that may be taken, should they become necessary, to bring your case to an ultimate conclusion.
On July 25, 1946, being eligible for separation under applicable regulations, plaintiff was given a terminal physical examination at the Separation Center, Fort Dix, New Jersey. Item 40 (Bones, Joints, Muscles) of the Report of Physical Examination contained the following notation: “[F]lexion right wrist limited weakness and pain IMS.” The results of a neurological consultation, report dated July 25, 1946, were recorded in the Report of Physical Examination, as follows:
Consultation Report: 25 July 1946, Neurological.
Impression: Paralysis, parted, moderate, chronic, IMS, right median nerve. Caused by shrapnel injury to right wrist on 11 November 1944 in France. Manifested by sensory disturbances, inability to flex wrist completely, and weak grip. Disability, moderate, progress, fair.
The Report of Physical Examination further indicated that plaintiff was not permanently incapacitated for general or limited service.
Effective as of October 9, 1946, the Veterans Administration rated plaintiff 30 percent disabled for “paralysis” of his right wrist and forearm. The rating was confirmed in subsequent medical examinations-until June 1949 when plaintiff was informed that he need not return for further examinations since his disability had become permanent and static.
At the time of the Korean hostilities in 1950 plaintiff was examined by the Army and was found not qualified for active duty.
Plaintiff in May 1951 consulted with an orthopedic specialist who confirmed that his disability was permanent, with the following diagnoses:
1 — Traumatic arthritis of the right wrist.
2 — Neurocirculatory changes in the right wrist and hand.
3 — Healed fractures of the right radius and ulna lower one third.
4 — Atrophy of the hand, forearm and arm.
*450 Plaintiff then applied to the Adjutant General for the reevaluation which he had been told would be made. On June 18, 1951 the Adjutant General replied that as a result of the Comptroller General’s opinion of April 25, 1951, the Department of the Army had no authority to take action in his case. The Adjutant General stated that the Department of Defense was proposing legislation to provide for such authority. No such legislation was ever enacted by the Congress.
In July 1955 this court decided in Updike v. United States, 132 C. Cls. 627, that the Comptroller General’s opinion was invalid or erroneous in law and that the Armed Services had authority to award retirement pay to persons disabled in active service but separated prior to a determination being made of their right to such pay.
On December 5, 1955, plaintiff called the Updilce decision to the attention of the Adjutant General and again requested a re-evaluation. Notwithstanding the Updike decision, plaintiff was not sent to a hospital for medical examination or to a physical evaluation board but was informed on December 20,1955, (1) that he could “request” a review by the Army Board for the Correction of Military Records, (2) that such Board was the only agency of the Army with authority to give further consideration to his case, and (3) that the filing of an application would not necessarily assure him of a hearing by the Board.
On January 9,1956, plaintiff filed application for the correction of his military records. He enclosed the statements of the orthopedic specialists to the effect that he (plaintiff) was incapacitated for general duty. Plaintiff also referred to the Veterans Administration’s determination that his disability was static and not subject to periodic examinations.
On February 7, 1956, the Surgeon General’s Office responded to the correction board’s “request for comment and opinion.” After reviewing the records the Surgeon General commented as follows:
1. The attached records in the case of Stanley Weiner, 0416200, have been carefully reviewed.
2. The records reveal that this officer was injured by multiple shell fragments, receiving a fracture of the radius and ulnar at the wrist joint with damage to *451 the radial artery and median nerve and tendons in the area of the right wrist.
3. The injuries healed with a residual impairment of the function of the right wrist. The case was seen repeatedly by disposition boards and Army retiring boards. At each time it was recommended that he remain on temporary limited duty or be on permanent limited duty. It appeared that the boards m general expected further improvement and that six months would see improvement of such degree as to warrant return to full general duty.
4. It appears that the defect did not change to any appreciable degree and has persisted to date.
5. The officer appears to feel that an error was made in not considering the condition as permanent. This would seem to be beside the point, which is, was the condition as it existed at the time, of such degree as to preclude military duty? The records are believed to substantiate that while the residual is permanent, it is not of such degree as to have precluded duty in a limited duty status, i.e., duty with assignment limitations.
6. Based upon the evidence of records, the opinion is expressed that at the time of this officer’s separation from the service he did not have a physical disability of such nature or degree as to have warranted his retirement because of physical disability under the laws, rules, regulations, or policies then in effect.
The plaintiff was not informed as to the correction board’s request, nor was he given an opportunity to comment upon or furnish any evidence with respect to the contents of thé Surgeon General’s opinion. No one in the Surgeon General’s Office ever saw or examined plaintiff.
On March 8, 1956, the correction board denied plaintiff’s application.
The shell, which penetrated plaintiff’s right wrist and forearm, damaged tendons, ruptured the radial artery which supplies one half of the circulation to the hand, injured the radial nerve, and caused a compound, comminuted fracture of the radius of the forearm, as well as the scaphoid and the ulna. As a result of these injuries, the plaintiff sustained a deformity of his right hand, pain, hypesthesia, or numbness, of hand and fingers due to circulatory changes, bluish color in cold weather, weakness in the right hand, and inability to do anything that requires the use of two normal hands, *452 limitation of motion, with considerable limitation of dorsal and palmar flexion and radial and ulnar deviation.
The injury to the radial nerve and radial artery interfered with blood supply to the right arm, caused atrophy, augmented by compulsory disuse, to the extent of one inch in the arm and forearm, in the hand muscles, in the thenar eminence (mound on the palms at the base of the thumb) and in the hypothenar eminence (ridge on the palm along the base of the fingers). It caused a distortion of the articular (joint) surfaces of the radius and ulna; exostosis (bony projection) over the radius; and irregularity of the scaphoid (outer bone of first row of carpal, or wrist, bones) and semilunar (second bone of first row of carpal bones); and a certain amount of destruction of the cartilage between the joints.
Prior to induction plaintiff took a pre-medical course at Cornell University, intending to practice medicine as his profession, and graduated in June 1941. Plaintiff felt that the injury to his right hand and arm would prevent him from effectively practicing medicine and, since he was right-handed, he would be unable to perform even minor surgery. Accordingly, he did not complete his study for a medical degree.
By reason of his injuries, plaintiff was, in October 1946, when separated from military service, permanently incapacitated to perform active or general duty.[1] It was impossible to determine at that time whether plaintiff’s then incapacity for active service was permanent or whether there would be improvement, as it usually requires three to six years to ascertain the final result in injuries of this kind, particularly in the articular (joint) surfaces. By 1951, however, plaintiff’s condition had become static, as shown by the fact that the X-rays taken by the plaintiff’s specialist, Dr. Cantwell, in 1955-1957 showed no essential change from that taken by *453 him in 1951. There has been no appreciable change or improvement in plaintiff’s condition since 1946.
From the foregoing recital of facts it is clear that plaintiff was injured, and obviously his injuries were service-connected. The question then is whether plaintiff’s injuries were such as to render him incapable of performing military service, within the meaning of the pertinent statutes and regulations.
With respect to the above question, the regulations and facts relative thereto are quite clear. Paragraph 56(d) of Technical Manual 12-245, October 1, 1945, provided:
When the board is unable to determine whether a disease, injury or infirmity is permanent the officer concerned should be found not permanently incapacitated for active service. In such cases the board will recommend temporary limited service for a period not to exceed six months and make an appropriate entry in Item 34 WD AGO Form 199. This entry will include a statement of such physical restrictions as may be indicated during the period of temporary limited service, and a recommendation or reexamination and reevaluation at the end of such period.
Paragraph 66 of Technical Manual 12-245 relating to the disposition of officers subsequent to appearance before an Army retiring board, provides as follows:
Found fit for general service or recommended for temporary limned service duty {AGF and ASF). Upon completion of the proceedings of an Army retiring board which finds an officer fit for general service or recommended for retention on temporary limited service in the case of officers under the command jurisdiction of the Commanding Generals, Army Ground Forces and Army Service Forces, the officer will remain on a patient status in the medical facility pending final action by the War Department on the Army retiring board proceedings. Instructions relative to assigning the officer or relieving him from active duty will be issued by The Adjutant General.
Paragraph 2 of Technical Manual 12-245 provides, in pertinent part, as follows:
2. Limited service status, a. Physical standards for commission and appointment of officers, warrant officers *454 and flight officers for active (general) military service are set forth in AK, 40-105 and 40-100, respectively.
b. Due regard will be given to the provisions of the above-mentioned regulations in considering the physical qualifications of officers for retention on active (general) service. However, in this connection, the mentioned regulations will not be as strictly interpreted as for appointment or entrance on active duty.
c. Thus, officers may be found capable of performing active (general) service even though they have diseases, injuries, or infirmities which would disqualify them for original appointment, provided such diseases, injuries or infirmities are of such a nature and degree as not to affect adversely the performance of active (general) service (including oversea duty) considering the individual’s age, grade, branch and MOS.
Thus, in plaintiff’s case, the retiring board was unable to determine whether the injury was permanent and consequently it found him not permanently incapacitated and recommended a further examination later.[2] Plaintiff was thereupon placed on temporary limited duty for six months, with re-examination and re-evaluation at the end of that time. Finally plaintiff was given a terminal physical examination and a resulting report that he was not permanently incapacitated for general or limited duty. This was all done in spite of the fact that it was impossible at that time to determine whether plaintiff’s incapacity was permanent or subject to improvement.
His condition did not improve, and finally plaintiff sought relief before the correction board. He was not given relief and the refusal was apparently based upon the recommendation of some person or persons in the Surgeon General’s Office, none of whom had ever seen or examined plaintiff. This was not fair to the plaintiff, especially in view of the fact that the only medical evidence before the correction board showed that plaintiff’s disability was real and permanent.
The defendant argues that plaintiff’s condition did not render him unfit for limited service and that limited service is general service within the meaning of the statutes and regulations.
*455 However, War Department Technical Manual 12-245, October 1,1945, provides in paragraph 60a, in part:
(2) * * * [A] n officer is permanently incapacited for active service when he becomes permanently physically or mentally incapacitated for the performance of full military duty, field as well as garrison, in both peace and war. * * *
If the Government’s contention is correct, a person could lose both legs, one arm and one eye, and still be fit for general service, because he could perform some limited-service duty. This we cannot conceive. Limited service is something that only arises in cases of emergency and there could be no reason to retain a partially incapacitated person in the service when his skills were not needed. As a matter of fact, Army regulations would undoubtedly prevent this. A.E. 605-10, 26 May 1944 (superseded by A.E. 605-10, 9 March 1946).
Furthermore, there is no compulsion that plaintiff remain in the service on limited duty. He had the right to get out and he did so.
The facts in this case are, in almost all respects, identical to the situation in Suter v. United States, 139 C. Cls. 466,[3] and our conclusion here, as in the Suter case, is that plaintiff was permanently disabled and unfit for general military service as a result of the injuries sustained in combat. The Army Board for the Correction of Military Eecords was arbitrary and capricious when, based upon the comment and opinion of the Surgeon General’s Office, it did not grant plaintiff the relief requested.
Plaintiff is entitled to a judgment for retired pay from the date of his release from the Army, less appropriate credit for payments which he has received from the Veterans Administration. The exact amount of the judgment will be determined pursuant to Eule 38(c) of the Eules of this court.
It is so ordered.
*456 Littleton, Judge {Bet.); Madden, Judge; Whitakek, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff entered active duty as a second lieutenant in the Army of the United States on August 1, 1941, after four years of training in the P.O.T.C. at Cornell University.
2. Plaintiff was trained as an Army Ordnance infantry platoon leader and was rapidly advanced, attaining the rank of lieutenant colonel. He was selected to help build up the armored forces of the Army and trained men for this purpose until September 1944, when he was ordered to combat duty as commander of the Twentieth Armored Infantry battalion of the Tenth Armored Division. In September 1944 he landed at Cherbourg on the Normandy Peninsula and moved forward into combat.
3. On November IT, 1944, in the battle for Metz and in the vicinity of Hallstroff, France, plaintiff was wounded while returning to his command post, a short distance behind the front line, after having been able to get his battalion, which had been stalled, to proceed with the attack. As he neared his post, the enemy forces, who had evidently been observing his movement, poured heavy mortar fire upon his vehicle. Plaintiff raised his right arm for protection and a piece of heavy mortar penetrated his forearm, came out the other side, passing his head, and struck and stunned his driver, who sat next to him.
4. As a result of this wound, plaintiff suffered a compound, comminuted fracture of the navicular bone (the scaphoid bone of the wrist), the radius (the bone on the outer or thumb side of the forearm), and the ulna (the inner and larger bone of the forearm on the side opposite that of the thumb). The ulna articulates with (1) the humerus (a bone which extends from the shoulder to elbow), (2) the *457 head of the radius at its proximal end, and (3) the radius and bones of the carpus at the distal end.[4]
The shell which penetrated plaintiff’s forearm and wrist, in addition to fracturing the aforesaid bones, damaged tendons, ruptured the radial artery, and injured the radial nerve.
5. Plaintiff was taken by ambulance to an aid station where he was given sedatives and while in the ambulance he lost much blood. He was admitted to the 34th Field Hospital where the radial artery was sutured, the wound debrided, and a traveling cast applied. He was then evacuated through various hospitals to the 52nd General Hospital in England, where he arrived about the end of November 1944. During his hospitalization in England he had two or three operations, and had various casts applied to his arm. Most of these casts extended from the shoulder to the hand, with a wire cage to keep the fingers straight and assist in getting the tendons back in position.
6. Near the end of January 1945 he was sent back to the United States for continued hospitalization. He arrived at Tilton General Hospital on January 29, where he was treated until April 1945, when the last cast was removed and physiotherapy begun. On April 6,1945, he appeared before a Disposition Board, was told that he was disabled for active or general service but that there was a possibility of improvement and he was placed on temporary limited duty for a period of six months.
7. During this period of temporary limited duty, plaintiff was sent to the Command and General Staff College at Fort Leavenworth for instruction in a thirteen-week General Staff class, which did not require any strenuous use of his arm. At the conclusion of this course in August 1945 he was asked to remain as an instructor. At the end of the six-month period of temporary limited duty, he was sent to the closest regional hospital, Fort Riley, Kansas, for revaluation. In November 1945, a Disposition Board found that plaintiff’s disability was permanent and he was placed in a status of permanent, rather than temporary, limited duty. He was given the *458 choice of continuing in a permanent limited duty status or appearing before a Retiring Board, and, because the Command and General Staff College requested him to finish the course he was teaching, he remained on limited duty for six months.
8. His status of permanent limited duty prevented him from applying for a commission in the Regular Army. In May 1946, upon completion of the course he was teaching, he was sent to Halloran General Hospital for appearance before a Disposition Board and Army Retiring Board.
9. Upon the recommendation of the Chief of the Orthopedic Service at Halloran General Hospital, plaintiff appeared before a Disposition Board at that hospital on July 13,1946. The Disposition Board, after careful consideration of clinical records, diagnosed plaintiff’s condition as follows:
Deformity of right hand, moderate, manifested by 25% loss of wrist flexion and extension and moderate sensory changes on palmar surface of right wrist and thumb, secondary to FCC, navicular, right, and FCC, radius and ulna, right, accidentally incurred when patient was wounded in action by enemy shrapnel on 17 Nov 44 near Hallstroff, France. LOD: Yes
The Disposition Board, further, found that plaintiff’s disability was partial. The Board recommended:
Lt. Col. Stanley Weiner, formerly classified in a permanent limited service status, be returned to duty in a temporary limited service status for a period of 6 months, at the expiration of which period he will be returned to an appropriate medical facility for reconsideration of his physical capacity for military duty.
10. Plaintiff was given a physical examination at the Hal-loran General Hospital on July 18, 1946. The report of that physical examination revealed, in part, the following:
(38) — Well healed incisional scar 1" x 1", palmar aspect, right wrist. Slight depressed scar, lateral aspect, right wrist.
(40) — Moderate loss of grip on right as compared with left. Loss of 25% in extension & flexion of rt. wrist. 10° loss of radial & ulnar deviation, rt. wrist; absent radial pulse, right.
(55) —Deformity of right hand, moderate, manifested by 25% loss of wrist flexion & extension and moderate *459 sensory changes on palmar surface of right wrist and thumb, secondary to FCC, navicular, right, and FCC, radius & ulna, right, accidentally incurred when patient was wounded in action by enemy shrapnel on 17 Nov 44 near Hallstroff, France.
11. The two doctors who gave plaintiff the physical examination on July 18, 1946, recommended that plaintiff be placed on temporary limited duty for six months, with revaluation at the expiration of that time.
12. The applicable regulations governing Eetiring Board proceedings, War Department Technical Manual 12-245, dated October 1,1945, provided that two officers of the Army Medical Corps would examine an officer appearing before the Board, file a report with the Board, and testify before it. The following provisions relating to medical witnesses are contained in the Technical Manual:
45. * * *
e. Medical witnesses are designated under instructions of the authority appointing the retiring board, but not by direction of the President. They will be Medical Corps officers who are not members of the Army retiring board. In designating medical witnesses the hospital commander will exercise extreme care to insure that those designated have appropriate professional qualifications and mature medical judgment. As many additional medical witnesses will be designated as are necessary to insure the appearance of medical officers qualified in the several fields of medicine. In practically all cases it will be in the best interests of the officer concerned and the Government to designate as one of the medical witnesses a specialist in the diagnosis and treatment of the disease, injury or infirmity on account of which the officer concerned is being considered. Such a medical witness is better qualified to present the case, give expert testimony and make appropriate replies to questions. Where the medical witnesses in a particular case are not specialists in the diagnosis and treatment of the pertinent disease, injury or infirmity, appropriate specialists will be called as witnesses by the retiring board, if indicated.
sjs í|; íjí *f*
47. * * *
d. The medical witnesses will:
(1) Review subject officer’s records forwarded by The Adjutant General.
*460 (2) Review clinical record and report of current disposition board.
(3) Obtain and review all available approved disposition board proceedings previously held on subject officer at other medical facilities.
(4) Obtain and review clinical records of former hospitalizations, when indicated.
(5) Make a physical examination and record the result of such examination on WD AGO Form 63, Report of Physical Examination. Such report will be complete and will include a thorough medical history, current physical findings, summary of progress during hospitalization, and reports of appropriate laboratory procedures. The nature, causes and permanency of any incapacity for active service found to exist will be stated in the written report. A joint report may be submitted.
* * * * *
(9) Have free and open discussion with the patient’s ward officer, the chief of division or service, and members of the disposition board, where doubt exists as to the diagnosis, permanency, incidence to military service, permanent aggravation by military service, etc.
13. On July 19, 1946, plaintiff appeared before an Army Retiring Board at the Halloran General Hospital. After a hearing at which plaintiff testified in his own behalf and cross-examined the two medical officers who had previously examined him, the Army Retiring Board, after deliberation and having considered the evidence presented in the case, found that “Lieutenant Colonel Stanley Weiner is not permanent [sic] incapacitated for active service at this time.” The Board made the following recommendation:
This officer be considered for a temporary limited service status for a period of six months with reexamination and reevaluation as to physical fitness at the end of that time.
The President of the Board then advised plaintiff, further, as follows:
You are informed that final action in your case will be taken by the War Department and you will be notified of such action by the Adjutant General of the Army.
You also are informed that it is the policy of the War Department not to recall an officer to active duty *461 without his consent while that officer is on terminal leave or after the expiration of his terminal leave.
If an officer is recommended for reexamination at the expiration of a stated period the War Department will authorize his admission to an Army hospital for the purpose of such reexamination while he is on an inactive status.
You also will be given certain information concerning the steps that may be taken, should they become necessary, to bring your case to an ultimate conclusion.
14. Plaintiff contended before the Board that his change from permanent to temporary limited duty was unwarranted; that his arm had not improved since November 1944, when he sustained his injuries, nor since the Fort Riley Disposition Board had placed him in permanent limited duty status. He also stated that he did not desire to remain in the Army on active duty in a limited service capacity.
15. Paragraph 56(d) of Technical Manual 12-245, October 1, 1945, provided:
When the board is unable to determine whether a disease, injury or infirmity is permanent the officer concerned should be found not permanently incapacitated for active service. In such cases the board will recommend temporary limited service for a period not to exceed six months and make an appropriate entry in Item 34 WD AGO Form 199. This entry will include a statement of such physical restrictions as may be indicated during the period of temporary limited service, and a recommendation or reexamination and reevaluation at the end of such period.
16. Paragraph 66 of Technical Manual 12-245 relating to the disposition of officers subsequent to appearance before an Army Retiring Board, provides as follows:
Found fit for general service or recommended, for temporary limited service duty {AQF and A/SFj. Upon completion of the proceedings of an Army retiring board which finds an officer fit for general service or recommended for retention on temporary limited service in the case of officers under the command jurisdiction of the Commanding Generals, Army Ground Forces and Army Service Forces, the officer will remain on a patient status in the medical facility pending final action by the War Department on the Army retiring board proceedings. Instructions relative to assigning the officer or *462 relieving him from active duty will be issued by The Adjutant General.
17. Paragraph 2 of Technical Manual 12-245 provides, in pertinent part, as follows:
2. Limited service status, a. Physical standards for commission and appointment of officers, warrant officers and flight officers for active (general) military service are set forth in AR 40-105 and 40-100, respectively.
b. Due regard will be given to the provisions of the above-mentioned regulations in considering the physical qualifications of officers for retention on active (general) service. However, in this connection, the mentioned regulations will not be as strictly interpreted as for appointment or entrance on active duty.
c. Thus, officers may be found capable of performing active (general) service even though they have diseases, injuries, or infirmities which would disqualify them for original appointment, provided such diseases, injuries or infirmities are of such a nature and degree as not to affect adversely the performance of active (general) service (including oversea duty) considering the individual’s age, grade, branch and MOS.
18. On July 25, 1946, being eligible for separation under applicable regulations, plaintiff was given a terminal physical examination at the Separation Center, Fort Dix, New Jersey. Item 40 (Bones, Joints, Muscles) of the Report of Physical Examination contained the following notation: “[F]lexion right wrist limited weakness and pain IMS.” The results of a neurological consultation, report dated July 25,1946, were recorded in the Report of Physical Examination, as follows:
Consultation Report: 25 July 1946, Neurological.
Impression: Paralysis, parted, moderate, chronic, IMS, right median nerve. Caused by shrapnel injury to right wrist on 17 November 1944 in Prance. Manifested by sensory disturbances, inability to flex wrist completely, and weak grip. Disability, moderate, progress, fair.
The Report of Physical Examination further indicated that plaintiff was not permanently incapacitated for general or limited service.
19. Plaintiff, having expressed his desire to be relieved from active duty, and being eligible for separation, was released from active duty on October 9,1946.
*463 In an Organized Eeserve Corps Current Status Questionnaire signed by plaintiff on May 11,1949, plaintiff expressed his opinion that he was at that time fitted for limited service and was most suited to serve in Military Occupation Specialty 2728, Instructor, Armored Unit.
20. Since plaintiff did not elect to continue in a temporary limited duty status, he was separated and released from active duty on October 9, 1946. Effective as of that date, the Veterans Administration rated plaintiff 30 percent disabled for “paralysis” of his right wrist and forearm, also noting a condition caused by scars to be not of a compensable degree. This rating was confirmed in subsequent medical examinations by the Veterans Administration until June 1949, when the rating was continued and plaintiff was informed that he need not return for further examinations since his disability had become permanent and static.
21. At the time of the Korean hostilities in 1950, plaintiff was examined by the Army and was found not qualified for active duty.
22. There having been no improvement in his arm, the Veterans Administration having found that his disability was static and permanent, and the Army having found him physically disqualified for active service, plaintiff, in May 1951, consulted an orthopedic specialist in New York City, Dr. Alan E. Cantwell, recommended to him by his family physician, Dr. George Sonnenberg, who confirmed that plaintiff’s disability was permanent, with the following diagnoses:
1 — Traumatic arthritis of the right wrist.
2 — Neurocirculatory changes in the right wrist and hand.
3 — Healed fractures of the right radius and ulna lower one third.
4 — Atrophy of the hand, forearm and arm.
23. Plaintiff applied to the Adjutant General for the revaluation which he had been told would be made, enclosing a copy of Dr. Cantwell’s statement of May 18,1951. He received a reply on June 18, 1951, stating that, as a result of the Comptroller General’s opinion of April 25, 1951, construing the Career Compensation Act of 1949 to preclude disability retirement pay to officers who were separated prior to a determination of their right to such pay, the Department *464 of the Army had no authority to take action in his case. The Adjutant General stated that the Department of Defense was proposing legislation to provide for such authority.
24. During the following four years, from 1961 to 1955, the plaintiff followed the legislation proposed by the Secretary of Defense in the hope that the Army would be given authority to act, but this legislation was never enacted by the Congress.
On July 12, 1955, the Court of Claims decided Updike v. United States, 132 C. Cls. 627, holding that the aforesaid Comptroller General’s opinion was invalid or erroneous in law and that the Armed Services had authority to award retirement pay to persons disabled in active service but separated prior to a determination being made of their right to such pay.
25. On December 5, 1955, the plaintiff called the Updike decision to the attention of the Adjutant General and again requested a revaluation, enclosing statements by Dr. Cantwell dated May 18,1951, and November 30,1955, describing plaintiff’s condition and stating that he was incapacitated for general duty as an officer in the Armed Forces.
26. Notwithstanding the Updike decision and the fact that plaintiff had, upon separation, been told that a revaluation would be made, he was not sent to a hospital for medical examination or to a Physical Evaluation Board (which succeeded, in large part, to the functions of the Army Retiring Board after the enactment of the Career Compensation Act of 1949), but was informed on December 20, 1955, (1) that he could “request” a review by the Army Board for the Correction of Military Records, (2) that such Board was the only agency of the Army with authority to give further consideration to his case, and (3) that the filing of an application would not necessarily assure him of a hearing by the Board.
27. On January 9, 1956, plaintiff, through an attorney at law, filed an application for the correction of his military records, in which he pointed out that, despite the Retiring Board’s recommendation for a revaluation of his physical capacity and his own requests therefor, he had not been afforded such revaluation. He enclosed Dr. Cantwell’s *465 statements of May 18, 1951, and November 30, 1955, and quoted the doctor’s statement that plaintiff was incapacitated for general duty. He referred to the Veterans Administration’s determination of June 21,1949, that his disability was static and not subject to periodic examination, and he requested a medical revaluation to confirm Dr. Cantwell’s diagnoses and conclusions.
28. On February 7, 1956, the Surgeon General’s Office responded to the Correction Board’s “Bequest for Comment and Opinion” as follows:
1. The attached records in the case of Stanley Weiner, 0416200, have been carefully reviewed.
2. The records reveal that this officer was injured by multiple shell fragments, receiving a fracture of the radius and ulnar at the wrist joint with damage to the radial artery and median nerve and tendons in the area of the right wrist.
3. The injuries healed with a residual impairment of the function of the right wrist. The case was seen repeatedly by disposition boards and Army retiring boards. At each time it was recommended that he remain on temporary limited duty or be on permanent limited duty. It appeared that the boards in general expected further improvement and that six months would see improvement of such degree as to warrant return to full general duty.
4. It appears that the defect did not change to any appreciable degree and has persisted to date.
5. The officer appears to feel that an error was made in not considering the condition as permanent. This would seem to be beside the point, which is, was the condition as it existed at the time, of such degree as to preclude military duty? The records are believed to substantiate that while the residual is permanent, it is not of such degree as to have precluded duty in a limited duty status, i.e., duty with assignment limitations.
6. Based upon the evidence of records, the opinion is expressed that at the time of this officer’s separation from the service he did not have a physical disability of such nature or degree as to have warranted his retirement because of physical disability under the laws, rules, regulations, or policies then in effect.
It does not appear that at any time prior to the denial of plaintiff’s application plaintiff or his counsel was advised *466 of the Correction Board’s request or the contents of the opinion of the Surgeon General. The plaintiff was never given an opportunity to comment upon, reject, or furnish any evidence with respect to the contents of this opinion, which was furnished the Correction Board. No one in the Surgeon General’s office saw or examined plaintiff.
29. The Correction Board did not give plaintiff a medical revaluation or a hearing, and, on March 8, 1956, denied plaintiff’s application.
30. The Army medical officers and boards who observed, examined, and treated plaintiff and considered his condition from 1944 to his separation in 1946, found that he was incapacitated for active or general service and was qualified only for limited duty. There was, however, a conflict of medical opinion as to whether his condition would improve. The final decision, when he was separated, was to allow further time to elapse to ascertain whether his condition would improve.
31. War Department Technical Manual 12-245, October 1, 1945, entitled “Physical Reclassification Retirement and Retirement Benefits for Officers,” provides, at paragraph 23, in part:
b. The word “disability” as used in section 5 of the act of 3 April 1939, as amended, with respect to retirement pay benefits means such disability as would constitute a basis for the retirement of Regular Army Officer personnel. Thus, what constitutes “incapacity for active service” for Regular Army officers likewise constitutes “disability” for officers who are not Regular Army officers.
c. The question whether an officer of the Regular Army is incapacitated for active service is one of fact. An officer is incapacitated for active service when lie is permanently physically or mentally incapable of performing full military duty, field as well as garrison, in both peace and war. The fact that an officer may be capable of performing limited military service with the supply arms and services does not prevent his retirement under section 1251, Revised Statutes, supra, by reason of being permanently incapacitated for active service.
Paragraph 60a provides, in part:
*467 (2) * * * [A]n officer is permanently incapacited for active service when he becomes permanently physically or mentally incapacitated for the performance of full military duty, field as well as garrison, in both peace and war. The fact that an officer may be capable of performing limited military service with the supply arms and services does not prevent a finding that he is incapacitated for active service. With respect to such an officer active service means general service.
Paragraph 60h provides, in part:
(1) When a retiring board is of the opinion that an officer appearing before it is capable of performing limited service, the board is authorized to recommend that he be considered for a limited service assignment. Such recommendation will be stated in Item 34.
(2) An officer is capable of performing limited service if he is physically fit for certain types of active military assignment commensurate with his physical condition even though he is disqualified under current physical standards for general military service.
(3) The recommendation of a retiring board that an officer be considered for a limited service assignment is not inconsistent with a finding of incapacity for active service and does not preclude his retirement or certification for retirement pay.
32. AE 605-250, March 28,1944, relating to Army Retiring Boards, provided in Section IY, entitled “Findings,” paragraph 30, in part, as follows:[5]
Incapacity, character of, etc. — a. Character. — Incapacity for service by reason of physical disability relates to a permanent incurable disease, injury, or infirmity which prevents the reasonable fulfillment of the purpose of the officer’s employment. Such employment embraces the duties of his office in peace and war which are imposed by law, regulation, orders, or custom of the service.
b. Permanency. — The physical disability, on account of which the board is authorized to find an officer incapable of performing the duties of his office, must be permanent; that is, such that the removal of the disability within a reasonable time is highly improbable. If, however, the disease or injury is curable or of such character as to yield to treatment, even though a cure *468 may require considerable time, the disability is not permanent. The test should be, is the disease or injury curable or incurable? If the disability is incurable within a reasonable time, the board should find the officer incapacitated.
Section VI, paragraph 87, entitled “Limited Service,” provided as follows:
Definition of “limited service.” — A limited service officer is one who is disqualified under current physical standards for general military service, but who has been classified, following thorough physical examination, as physically fit for certain types of active military assignments commensurate with his physical qualifications.
33. The shell which penetrated plaintiff’s right wrist and forearm damaged tendons, ruptured the radial artery which supplies one half of the circulation to the hand, injured the radial nerve, and caused a compound, comminuted fracture of the radius of the forearm, as well as the scaphoid and the ulna. As a result of these injuries, the plaintiff sustained a deformity of his right hand, pain, hypesthesia, or numbness, of hand and fingers due to circulatory changes, bluish color in cold weather, weakness in the right hand, and inability to do anything that requires the use of two normal hands, limitation of motion, with considerable limitation of dorsal and palmar flexion and radial and ulnar deviation.
The injury to the radial nerve and radial artery interfered with blood supply to the right arm, caused atrophy, augmented by compulsory disuse, to the extent of one inch in the arm and forearm, in the hand muscles, in the thenar eminence (mound on the palm at the base of the thumb) and in the hypothenar eminence (ridge on the palm along the base of the fingers). It caused a distortion of the articular (joint) surfaces of the radius and ulna; exostosis (bony projection) over the radius; and irregularity of the scaphoid (outer bone of first row of carpal, or wrist, bones) and semilunar (second bone of first row of carpal bones); and a certain amount of destruction of the cartilage between the joints.
The residual conditions caused by plaintiff’s combat injury have been diagnosed by Dr. Cantwell as neurocirculatory changes in the wrist and hand; atrophy of the hand, forearm *469 and arm; and traumatic arthritis of the right wrist which may eventually require a wrist fusion. He stated the conditions were permanent and equivalent to a 40 percent loss of function of the wrist and hand. The current permanent Veterans Administration rating of 30 percent under the designation of “Paralysis” has been in effect since originally rated in 1946.
34. While at Cornell, plaintiff took a premedical course, intending to practice medicine as his profession, and graduated in June 1941. His curriculum consisted of chemistry (qualitative and quantitative analysis, and inorganic), anatomy, physiology, embryology, comparative anatomy, human anatomy, and physics. Because he was an honor graduate of the E.O.T.C., he was offered a commission in the Regular Army, but rejected this because of his plans to go to medical school.
Plaintiff felt that the injury to his right hand and arm would prevent him from effectively practicing medicine and, since he was right-handed, he would be unable to perform even minor surgery. Accordingly, he did not complete his study for a medical degree.
35. By reason of his injuries, plaintiff was, in October 1946, when separated from military service, permanently incapacitated to perform active or general duty.[6] It was impossible to determine at that time whether plaintiff’s then incapacity for active service was permanent or whether there would be improvement, as it usually requires three to six years to ascertain the final result in injuries of this kind, particularly in the articular (joint) surfaces. By 1951, however, plaintiff’s condition had become static, as shown by the fact that the X-rays taken by the plaintiff’s specialist, Dr. Cantwell, in 1955-1957 showed no essential change from *470 that taken by him in 1951. There has been no appreciable change or improvement in plaintiff’s condition since 1946.
CONCLUSION OF LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and judgment will be entered to that effect.
The amount of recovery will be determined pursuant to Eule 38 (c) of the Eules of this court.
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on April 22, 1960, that judgment for the plaintiff be entered for $34,918.31.

 This is based upon the testimony of Dr. Alan K. Cantwell, a specialist in orthopedic surgery, Associate Professor of this subject at New York Medical College, and a Fellow of the American College of Surgeons, International College of Surgeons, and Pan-American College of Surgeons, Diplómate of the American Board of Orthopedic Surgery. There is no contrary expert medical opinion in the testimony, the Government having presented no witness at the trial. The testimony of the medical witnesses upon which the Board’s finding was predicated discloses that they felt plaintiff was permanently incapacitated at that time but that there was a chance for improvement in his condition.

This in spite of the fact that a previous disposition board had found plaintiff’s disability to be permanent.

 The writer of this opinion dissented in the Suter case for the reason that plaintiff’s claim accrued when he was separated from the Army and hence was barred by the 6-year statute of limitations. Since the majority of the court is of the opinion that the 6-year limitation statute has no applicability in a situation such as presented here, no useful purpose would be served by pursuing this course.

 Definitions of medical terms in these findings are from Dorland, Medical Dictionary, 22nd Edition.

 These provisions quoted in Patterson v. United States, No. 23-56, decided by this Court March '5, 1958, slip opinion p. 12.

 Ills finding is based upon the testimony of Dr. Alan R. Cantwell, a specialist in orthopedic surgery, Associate Professor of this subject at New York Medical College, and a Fellow of the American College of Surgeons, International College of 'Surgeons, and Pan-American College of Surgeons, Diplómate of the American Board of Orthopedic Surgery. There is no contrary expert medical opinion in the testimony, the Government having presented no witness at the trial. The testimony of the medical witnesses upon which the Board’s finding was predicated discloses that they felt plaintiff was permanently incapacitated at that time but that there was a chance for improvement in his condition.