JoNes, Chief Judge,
delivered tbe opinion of the court:
This is a congressional reference case. The plaintiff, a Reserve officer serving with the Army Air Forces at the time, was severely wounded on June 7,1944, while participat *187 ing as a glider pilot in the invasion of Western Europe by the Allied forces. He was released from active military duty at the close of the day, December 31, 1945. He seeks retirement pay for physical disability. The principal question involved in the case is whether the plaintiff, at the time of his release, was permanently incapacitated for active service as a military officer.[1]
The evidence in this case was taken before Mastín G. White, one of our trial commissioners, who heard the witnesses and examined the documents in the case.
We have adopted the trial commissioner’s findings with only a minor change.
The facts are summarized as follows:
It will be noted from the findings of fact that the Army Eetiring Board met on October 5, 1945, and found that the plaintiff “is permanently incapacitated for active service” due to his injuries.
The Office of the Surgeon General disagreed with the Army Eetiring Board to the effect that plaintiff was permanently incapacitated for active service. The Office of the Surgeon General recommended that the record of the plaintiff be returned to the Eetiring Board for reconsideration. Upon reconsideration, the Army Eetiring Board on November 27, 1945, reversed its previous finding and found that First Lieut. Dickson “is not permanently incapacitated for active service.” The Board recommended a 6 months’ temporary limited service involving little standing, walking, and no drill or marching, and at the end thereof that the officer be returned to an appropriate medical facility, preferably a plastic surgery center, for re-examination and re-evaluation.
After further hospitalization, the Board again confirmed its previous findings. The plaintiff took an appeal from the action taken by the Army Eetiring Board to the Disability Eeview Board. The Army Disability Eeview Board confirmed the second findings of the Eetiring Board overruling a motion for rehearing on August 30,1951. The War Department concurred in the findings of the Army Eetiring Board.
*188 The plaintiff, on June 4, 1954, filed with the Air Force Board for the Correction of Military Becords an application for the correction of his military record. The plaintiff made a personal appearance before the Board and was represented by counsel. At the conclusion of the proceedings, the Air Force Board for the Correction of Military Becords, on April 2,1958, held that applicant had failed to demonstrate that his record should be corrected as requested by him.
It will be noted that the resolution authorizes this court to determine whether there is a claim “legal or equitable against the United States and if so the amount legally or equitably due.” [2]
The plans for the invasion of Western Europe by the Allied forces called for the utilization of three glider lifts. The plaintiff was assigned to the lift that was to land in Normandy at dawn on the second day of the invasion, on June 7, 1944. The lift took off before dawn from England through overcast and rain and headed for France. Each glider was towed by a C-47 engine-driven aircraft. The plaintiff had a co-pilot with him, and each glider carried eight infantrymen and considerable equipment. Upon reaching the coast of France the plaintiff was cut loose from the tow plane and he prepared to land his glider in a small field that was situated about 5 miles inland from the coast. When the glider was about 75 feet above the ground both the plaintiff and his co-pilot were severely injured as the result of gunfire. The co-pilot was wholly incapacitated and the plaintiff’s right leg was broken and fractured. In spite of the wound, the plaintiff landed the glider without injury to the infantrymen or damage to the cargo aboard.
The plaintiff’s wound was caused when the right leg was struck by fragments from a bursting enemy shell, resulting in a compound, comminuted fracture in the upper third of the right tibia and injury to the soft tissues in that part of the leg. After landing his glider, the plaintiff crawled away, took off his belt and used it to stop the flow of blood from the leg. He also gave himself a “shot” of morphine. *189 This was about 7 o’clock in the morning of June 7, 1944. Plaintiff received his first medical attention about 1:30 that afternoon in the form of first aid from a medical corpsman, who sprinkled sulpha powder in the wound, put a splint on the leg, and gave the plaintiff another “shot” of morphine. He was removed to the beach later in the afternoon where he remained all night. He was placed on board a ship that departed for England in the late afternoon.
This was a daring flight in the greatest military invasion of all history. The injury was a serious one. Under battle conditions, he probably received the best attention that it was possible for him to be given. Nevertheless, he did not reach England until June 9, whereupon he was taken to the field hospital. A day or two later he was transferred to the General Hospital in England, and the plaintiff’s wound was given the first real' medical treatment. The wound was cleaned, and the entire right leg was placed in a cast. The plaintiff’s leg was kept in a cast until January 1945. The cast was wedged to prevent a bowing of the bone at the fracture site. With the delay made necessary by the circumstances it is almost a miracle that he did not lose his leg, if not his life. Certainly, it is a tribute to medical science that he survived without at least losing a leg. The delay undoubtedly contributed to the seriousness of his condition.
There is a conflict in the medical testimony but it appears from the record that the medical officers who saw him first and who examined him more closely gave it as their opinion that he was permanently incapacitated. The record contains several affidavits by medical authorities who saw him during and after the invasion and who gave as their opinion that he was permanently incapacitated.
Specifically, the War Department Technical Manual 12-245 (1 October 1945) provides that whether an officer is incapacitated for active service is a question of fact. It further provides that “* * * [a]n officer is incapacitated for active service when he is permanently physically * * * incapable of performing full military duty, -field as well. as garrison, in both peace and war.” A further provision is “[t]he fact that an officer may be capable of performing *190 limited military service with the supply arms and services does not prevent his retirement under section 1251, Revised Statutes, * * It is indisputable that at the time of his release he was permanently incapacitated from walking more than a short distance, and that a glider pilot with such a disability is permanently incapacitated as a matter of law for “the duties of his office in peace and war which are imposed by law, regulations, orders, or custom of the service.” See War Department Technical Manual 12-245, quoted in finding 32; Weiner v. United States, 148 Ct. Cl. 445 (1960); Harper v. United States, decided this day, ante, p. 135. Consequently, plaintiff was incapacitated for active service and was qualified for retirement under the above-cited War Department Technical Manual and applicable statutes.
It will be noted, however, that neither the resolution of reference nor the statute itself authorizes the court to waive the statute of limitations, which requires that a cause of action be barred unless suit is filed within 6 years from the time the cause of action first accrued. It accrued more than 6 years prior to the resolution of reference and the filing of a suit pursuant thereto.
CONCLUSION
We conclude, on the basis of the facts set out in detail in the findings of fact, that plaintiff, but for the statute of limitations, has both a legal and an equitable claim against the United States measured by the disability retirement pay of a first lieutenant with his record of service, from which should be deducted payments made under the Veterans Administration finding of disability.
This opinion and the findings of fact, together with the conclusion thereon, will be certified by the Clerk to Congress pursuant to Senate Resolution 107, 86th Congress, 2d session.
Davis, Judge; Durtee, Judge; Laramore, Judge; and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
*191 1. The plaintiff, Archie L. Dickson, Jr., is a citizen of the United States and a resident of the State of Mississippi.
2. The plaintiff attended the University of Mississippi, and graduated from that institution in 1940. Upon the basis of his participation in the Reserve Officers Training Corps program while a student, the plaintiff was commissioned a second lieutenant of infantry in the Officers Reserve Corps of the Army on June 1, 1940. He volunteered for a 1-year tour of active military duty, was accepted by the Army, and reported for such duty on July 5, 1940.
3. After serving on active duty for 1 year as an infantry officer, the plaintiff returned to the University of Mississippi in 1941 and entered the law school of the university.
4. Shortly after this country became an active participant in World War II, the plaintiff was recalled by the Army for an extended tour of active military duty. The plaintiff reported on February 14, 1942, for duty with the armored forces at Fort Knox, Kentucky. He was promoted to first lieutenant on June 4,1942.
5. In June of 1942, the plaintiff volunteered for service as a glider pilot. After undergoing a period of training, the plaintiff received his wings as a glider pilot in January of 1943.
6. The plaintiff was assigned to the 434th Troop Carrier Group of the Army Air Forces, and he went overseas to England with that group in the fall of 1943. In England, the plaintiff underwent further training in preparation for the invasion of Western Europe by the Allied forces.
7. The plans for the invasion of Western Europe by the Allied forces called for the utilization of three glider lifts. The plaintiff was assigned to the lift that was to land in Normandy at dawn on the second day of the invasion (i.e., on June 7, 1944). The lift took off before dawn through overcast and rain, assembled over England, and headed for France. Each glider was towed by a C-47 engine-driven aircraft. The plaintiff had a co-pilot with him. His glider carried eight infantrymen from the 82nd Airborne Division and 1,000 pounds of that division’s signal equipment.
8. After reaching the coast of France, the plaintiff cut loose from the tow-plane and prepared to land his glider in *192 a small field that was situated about 5 miles inland from the coast and near the town of Ste. Mere Église in Normandy. When the glider was about 75 feet above the ground, both the plaintiff and his co-pilot were severely wounded as a result of enemy gunfire. The co-pilot was wholly incapacitated, and the plaintiff’s right leg was broken. Despite his wound, the plaintiff managed to- land the glider without injury to the infantrymen or damage to the cargo aboard the glider.
9. The plaintiff’s wound was caused when the right leg was struck by fragments from a bursting enemy shell. The result was a compound, comminuted fracture in the upper third of the right tibia and injury to the soft tissues in that part of the leg. After landing his glider and crawling away from it, the plaintiff took off his belt and used it as a tourniquet to stop the flow of blood from the leg. He also gave himself a “shot” of morphine. That, was about 7 o’clock in the morning of June 7,1944. At about 1 or 1:30 that afternoon, the plaintiff received his first medical attention. It was in the form of first aid from a medical corpsman, who sprinkled sulpha powder in the wound, put a splint on the leg, and gave the plaintiff another “shot” of morphine. The plaintiff was removed to the beach later in the afternoon, and he remained on the beach all night. On June 8, the plaintiff was put on board a ship, which departed for England later in the day. The ship reached England on June 9, and the plaintiff was taken to the 228th Field Hospital. A day or two later, the plaintiff was transferred to the 53rd General Hospital in England. It was there that the plaintiff’s wound was given the first medical treatment (other than first-aid treatment). The wound was cleaned, and the entire right leg was placed in a cast.
10. The plaintiff’s case was considered by a disposition board at the 53rd General Hospital on July 5, 1944. The board found that the plaintiff was unfit for further duty in the European Theater of Operations because of the necessity for more than 180 days of hospitalization before he would be able to return to duty. The board recommended that the plaintiff be transferred to the Zone of the Interior for further hospitalization and treatment.
*193 11. Upon being evacuated by air to the United States in July 1944, the plaintiff was sent to the Foster General Hospital at Jackson, Mississippi, where he remained until April 1945. The plaintiff’s right leg was kept in a cast until January 1945, and, during part of this time, the cast was wedged in order to correct a bowing of the bone at the fracture site. Two operations were performed on the plaintiff at the Foster General Hospital. One operation was for the removal of scar tissue. In the other operation, a tendon was transplanted from the second toe of the right foot to the big toe.
12. The plaintiff was transferred from the Foster General Hospital to the AAF Convalescent Hospital at Fort Thomas, Kentucky, in April of 1945. A disposition board at the latter hospital considered the plaintiff’s case on June 16, 1945. The board’s diagnosis was in part as follows:
Ankylosis, fibrous, great and 2nd toes, right, partial, secondary to wound, perforating, right leg, incurred 7 June 1944 * * *. Transplantation of extensor tendon, second toe, with extensor hallicis longus, at Foster General Hospital, 6 March 1945. Improved. LD: Yes.
The board recommended that:
1st Lt. Archie L. Dickson, formerly classified as qualified for full military duty be returned to duty in a temporary limited service status for a period of six months, at the expiration of which period he will be returned to an appropriate medical facility for reconsideration of his physical capacity for military duty.
The board’s recommendation was approved by the commanding officer of the hospital on June 18,1945.
13. The plaintiff was released from the AAF Convalescent Hospital at Fort Thomas, Kentucky, in June of 1945. After a 30-day period of leave, he reported on July 28,1945, for limited service with the Air Intelligence Unit of the Army Air Forces Personnel Distribution Command at San Antonio, Texas. After a time, the plaintiff reported to the medical authorities that he was unable to do the walking that was necessary in order to travel between his quarters *194 and bis office, and between each of those points and the mess hall. Each trip involved a distance of about one-half mile.
14. The plaintiff was admitted to the AAF Regional and Convalescent Hospital at San Antonio, Texas, on September 1,1945. A disposition board at that hospital considered the plaintiff’s case on September 17,1945. This board made the following diagnosis:
1. Ankleosis [sic], partial, fibrous, moderate, ankle, right.
2. Scar, painful, posterior and medial aspect midportion leg, right.
1 and 2 secondary to wound perforating leg, right * * *. LOD: 1 and 2, Yes.
The board recommended that:
1st Lt. Archie L. Dickson, Jr. be classified from Temporary Limited Service to Permanent Limited Service, but inasmuch as he is considered non-essential, that he be ordered to appear before an Army Retiring Board.
The board’s recommendation was approved by the commanding officer of the hospital on September 18, 1945.
15. (a) An Army Retiring Board met on October 5,1945, at the AAF Regional and Convalescent Hospital, San Antonio, Texas, to consider the plaintiff’s case. The plaintiff appeared before the Board and testified.
(b) The Retiring Board made the following finding:
First Lieutenant Archie L. Dickson, Jr., O 391 864, AC, is permanently incapacitated for active service.
(c) The Retiring Board stated the cause of the plaintiff’s incapacity in the following findings:
1. Ankylosis, partial, fibrous, moderate, ankle, right.
2. Scar, painful, posterior and medial aspect mid-portion leg, right.
1 and 2 secondary to wound perforating leg, right * * *
16. Shortly after appearing before the Retiring Board mentioned in finding 15, the plaintiff, who had been declared by the Army Air Forces to be nonessential and by the Army Retiring Board to be permanently incapacitated for active service, was placed in a terminal leave status on October 8, *195 1945, and be departed for his home in Mississippi. His period of terminal leave extended through December 31, 1945.
17. The Office of the Surgeon General of the Army disagreed with the finding of the Army Retiring Board dated October 5, 1945, to the effect that the plaintiff was permanently incapacitated for active service. In a memorandum dated November 1,1945, and addressed to the Adjutant General of the Army, the Office of the Surgeon General stated that “The record reveals that appropriate treatment has effected a marked improvement in this officer’s condition,” and that “It is felt that this officer’s condition will improve still further.” The Office of the Surgeon General recommended that the record relating to the plaintiff’s case be returned to the Retiring Board for reconsideration.
18. An Army Retiring Board met on November 27, 1945, at the AAF Regional and Convalescent Hospital, San Antonio, Texas, for reconsideration of the plaintiff’s case. The plaintiff was in Mississippi at the time and did not appear before the Board. The Board paid particular attention to the comments of the Office of the Surgeon General of the Army, and made the following finding:
First Lieutenant Archie L. Dickson, Jr., O 391 864, AC, is not permanently incapacitated for active service.
The Retiring Board made the following recommendation:
Temporary Limited Service for six months at a fixed installation within the continental limits of the United States with duties involving little standing, walking, and no drill or marching, and that on or about 27 May 1946 officer be returned to an appropriate medical facility, preferably a plastic surgery center such as Northing-ton General Hospital, Tuscaloosa, Alabama for reexamination and re-evaluation.
19. The plaintiff, upon the expiration of his period of terminal leave, was released from active military duty at the close of December 31, 1945.
20. By means of a communication dated January 26,1946, the plaintiff was notified that the War Department had concurred in the finding of the Army Retiring Board dated November 27,1945, “to the effect that you are not incapacitated *196 for active service.” The plaintiff was informed that he might request an authorization to appear before another Army Retiring Board in 6 months, without expense to the Government.
21. The plaintiff, at his own expense, entered the Kennedy General Hospital at Memphis, Tennessee, on April 3, 1946, for reexamination. A disposition board at that hospital considered the plaintiff’s case on April 8, 1946. The board made the following diagnosis:
Cicatrix, lateral and medial aspects of mid-tibial region right leg, caused by wound, shell fragment, * * * manifested by mild extensor weakness of 2nd and great toes and mild pain at site of wound. Improved. LOD: Yes.
The board made the following recommendation:
1st Lt. Archie L. Hickson, formerly classified in a temporary limited service status, be reclassified to full military duty; that this officer be ordered to appear before an Army Retiring Board for administrative purposes and final clarification of physical status.
The recommendation of the board was approved on April 12, 1946, by the commanding officer of the hospital.
22. An Army Retiring Board met on May 21, 1946, at the Kennedy General Hospital, Memphis, Tennessee, to consider the plaintiff’s case. The plaintiff personally appeared before the Board. The Retiring Board made a finding to the effect that “1st Lt Archie L. Dickson is not permanently incapacitated for active service.”
23. Pursuant to an application filed by the plaintiff, the Veterans Administration on June 19, 1946, awarded the plaintiff a disability rating of 30 percent as of January 1, 1946, on the basis of his service-connected gunshot wound of the right leg. By virtue of this action, the plaintiff has been and is receiving compensation from the Veterans Administration.
24. (a) The plaintiff took an appeal from the action of the Army Retiring Board mentioned in finding 22 to the Army Disability Review Board, which had been established by the Secretary of War for the purpose of reviewing cases under the provisions of Section 302 of the Servicemen’s Readjustment Act of 1944 (58 Stat. 284, 287). This Board *197 held a hearing on October 31, 1947, relative to the plaintiff’s case. The plaintiff was present with counsel and testified before the Board.
(b) The Army Disability Beview Board made a determination in the plaintiff’s case on November 18, 1947. The Board found:
That First Lieutenant Archie L. Dickson, Jr., 0-391864, AC, is not permanently incapacitated for active service.
25. (a) The plaintiff filed an application for a rehearing before the Army Disability Beview Board. The Board considered the application at a meeting on May 13,1948, and made the following findings:
2. The applicant has not presented to the board new, pertinent and material evidence bearing upon his case which, if previously considered, could reasonably be expected to cause a finding other than the decision rendered at the original hearing.
3. The board concludes, therefore, that a formal rehearing is not justified under existing policies, and recommends that same be denied.
(b) The action of the Army Disability Beview Board was approved by direction of the President.
26. After the establishment of the Air Force Disability Beview Board, the plaintiff asked for a rehearing before that Board. The Board met on August 30, 1951, and considered the plaintiff’s case. The Board made the following finding:
After careful deliberation, the Air Force Disability Beview Board finds that appellant has presented to the Board no new, pertinent and material evidence bearing upon his case which warrants further consideration of his application for disability retirement benefits.
27. (a) The plaintiff under the date of June 4, 1954, filed with the Air Force Board for the Correction of Military Becords an application for the correction of his military record. The plaintiff’s application contained the following request:
That my release from active service be shown as retired for physical disability incurred in line of duty in *198 actual combat with the enemy as the result of wounds received June 7, 1944 in the European Theatre during the Normandy invasion, as shown by official medical diagnosis of record in applicant’s case.
(>b) The Air Force Board for the Correction of Military Becords met on February 19 and April 2, 1958, for the consideration of the plaintiff’s application. The plaintiff made a personal appearance before the Board, and was represented by counsel.
(c) At the conclusion of its proceedings, the Air Force Board for the Correction of Military Becords held “that applicant has failed to demonstrate that his record should be corrected as requested by him,” and that “his application should be denied.” The Board recommended to the Secretary of the Air Force that “The application of ABCHIE L. DICKSON, JB., AO 391 864, * * * before the Air Force Board for the Correction of Military Becords be denied.”
(d) Under the date of June 6, 1958, an Assistant Secretary of the Air Force issued to the chairman of the Air Force Board for the Correction of Military Becords a memorandum stating in part as follows:
Having received and approved the recommendation of the Air Force Board for the Correction of Military Becords in the case of ABCHIE L. DICKSON JB., AO 391 864, and under authority of Section 1552, Title 10, United States Code * * *, it is directed that:
1. The application of ABCHIE L. DICKSON JB., AO 391 864, Docket Number 55-126, before the Air Force Board for the Correction of Military Becords be, and it hereby is, denied.
(e) By means of a letter dated June 9, 1958, the plaintiff was notified of the decision that had been made by the Air Force Board for the Correction of Military Becords. This letter stated in part as follows:
A review of your case has been held in accordance with the regulations governing the procedures of the Air Force Board for Correction of Military Becords.
It is the Board’s decision that no change, correction of [sic] other modification of your military record is warranted under the circumstances of this case. The Assistant Secretary of the Air Force has reviewed the proceedings of the Board and has approved the decision *199 of the Board. A copy of the approved decision is enclosed.
28. On April 10, 1959, there was introduced in the Senate of the United States a bill (S. 1651) for the relief of Archie L. Dickson, Jr. The bill provided as follows:
Be it enacted by the Senate a/nd Howe of Representatives of the United States of America in Congress assembled, That (a) the Secretary of the Air Force is authorized and directed to determine the amount, and effective date of the retirement pay to which Archie L. Dickson, Junior, would have been entitled if (1) the Office of the Surgeon General of the Army in reviewing his case in 1945 and 1946 had found that the said Archie L. Dickson, Junior, was, at the time he was relieved from active duty in 1946, permanently incapacitated for active service and that his incapacity for active service was the result of an incident of service as a commissioned officer in the United States Air Force incurred in line of duty not due to his own misconduct and such a finding had been approved by the President or his delegate, and (2) the Department of the Air Force thereupon had certified Archie L. Dickson, Junior, in the grade of first lieutenant to the Veterans’ Administration for the receipt of retired pay under the Act of April 3, 1939 (53 Stat. 557; 10 U.S.C. 3687).
(b) Upon such determination, the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the said Archie L. Dickson, Junior, after deducting any disability compensation he has received from the Veterans’ Administration, retired pay in such amount upon the conditions which would have been applicable if such certification had been made pursuant to the Act of April 3,1939 (53 Stat. 557; 10 U.S.C. 3687).
(c) From the date of enactment of this Act it shall be held and considered that Archie L. Dickson, Junior, has been retired for physical disability and the Secretary of the Air Force is directed to pay him retired pay accordingly.
29. On June 2,1960, the following resolution (S. Kes. 107) was adopted by the Senate of the United States:
Resolved, That the bill (S. 1651) entitled “A bill for the relief of Archie L. Dickson, Junior”, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with *200 tbe provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
30. In accordance with Buie 14, the plaintiff filed his petition in this court on July 12, 1960. After a pretrial conference, trial sessions were held in Biloxi, Mississippi, and in Washington, D.C.
31. (a) The evidence in the record warrants the following conclusions regarding the plaintiff’s physical condition at the time of his release from active military duty:
(1) The compound, comminuted fracture of the right tibia resulting from enemy gunfire on June 7,1944, had been the subject of excellent healing. There was a good alignment of the bone. Although there was a slight irregularity in the contour of the bone, the bowing was not sufficient to be of clinical significance, and the bone appeared to be adequate to withstand all normal stress and strain. The right leg was from one-fourth to one-half inch shorter than the left leg.
(2) There was a stiffness in the right ankle, as the plaintiff had suffered a loss of the extremes in the range of motion in that ankle. However, he had a satisfactory functional range of motion in the right ankle for normal walking a short distance.
(3) There was a partial loss of function in the second toe of the right foot (from which a tendon had been transplanted to the big toe of the right foot), but the second toe is functionally of little importance in the foot.
(4) There were a number of small metallic fragments in the soft tissues of the right leg, near the site of the original wound, and some fragments were imbedded in the outer portion of the bone.
(5) A blood vessel in the right leg was blocked, but this had largely been compensated for by other blood vessels, and the circulation in the right leg was adequate.
*201 (b) In so far as the objective evidence in the record is concerned, the inference is warranted that the plaintiff, at the time of his release from active military duty at the close of December 31,1945, was physically capable of performing fully the duties of a military officer, except any duties requiring participation in long marches. With respect to the plaintiff’s physical incapacity to participate in long marches, the evidence indicates that this incapacity was a permanent one.
(c) Subjectively, the plaintiff has consistently complained, both during the months immediately preceding his release from active military duty and subsequent to that time, that he cannot walk or stand for any substantial period without experiencing pain in the right leg. There is no physical evidence which clearly establishes a connection between these subjective complaints of the plaintiff and the wound which the plaintiff received on June 7,1944. However, a medical witness at the trial theorized that a nerve in the plaintiff’s right leg may have been severed in connection with his wound; that during the healing process, the portion of the severed nerve which was still connected with the nervous system put out small, tentacle-like segments in an attempt to reestablish contact with the other portion of the severed nerve; that this attempt to reestablish continuity of the nerve was unsuccessful, and the nerve segments formed a mass of fibers in a ball-like arrangement called a neuroma; that when the plaintiff stands or walks on the right leg for any substantial period, this creates pressure on the neuroma, which, in turn, causes spasms in certain blood vessels of the right leg; and that the pain complained of by the plaintiff is a manifestation of this reaction. If this theory is correct and the plaintiff has a neuroma, this phase of his condition can be corrected by surgery.
32. War Department Technical Manual 12-245 (1 October 1945), dealing with the subject of “Physical Reclassification, Retirement, and Retirement Benefits for Officers,” provided in pertinent part as follows at the time of the plaintiff’s release from active military duty:
23. Nature of permanent incapacity for active service.
*202 b. The word “disability” as used in section 5 of the act of 3 April 1939, as amended, with respect to retirement pay benefits means such disability as would constitute a basis for the retirement of Regular Army officer personnel. Thus, what constitutes “incapacity for active service” for Regular Army officers likewise constitutes “disability” for officers who are not Regular Army officers.
c. The question whether an officer of the Regular Army is incapacitated for active service is one of fact. An officer is incapacitated for active service when he is permanently physically or mentally incapable of performing full military duty, field as well as garrison,, in both peace and war. The fact that an officer may be capable of performing limited military service with the supply arms and services does not prevent his retirement under section 1251, Revised Statutes, * * * by reason of being permanently incapacitated for active service.
d. Incapacity for active service is a permanent condition, resulting from an incurable disease, injury or infirmity of such a character as to prevent the reasonable fulfillment of the officer’s employment. Such employment embraces the duties of his office in peace and war which are imposed by law, regulation, orders, or custom of the service. The physical disability, on account of which the board is authorized to find an officer incapable of performing the duties of his office, must be permanent; that is, such that the removal of the disability within a reasonable time is highly improbable. If the disease, injury or infirmity is curable within even a considerable time, the disability is not permanent. However, if the disease, injury or infirmity is incurable within a reasonable time, the board should find the officer permanently incapacitated.

 Since the evidence in this case was taken, and the findings of the trial commissioner reported prior to the opinion of the Supreme Court in Glidden Company v. Zdanok, 370 U.S. 530, we think it proper to file the report without reference to the Supreme Court’s opinion in that case.

 We interpret the phrase “equitably due” not in a strict technical sense, but on the broad principles of equity and good conscience. Cuyahoga County, Ohio v. United States, 155 Ct. Cl. 307, 294 F. 2d 775.