Dukeeb, Judge,
dissenting:
I respectfully dissent from the conclusion of the majority which, “in this very close case,” affirms the findings of the Trial Commissioner that plaintiff was not disabled at the time of his separation from the service. My concurrence in the majority opinion could only add strength to the overworked, but herein appropriate, legal maxim that hard cases make bad law.
In my opinion, plaintiff has established by a clear preponderance of the evidence that his physical condition on November 8, 1945, the date of his release from active duty, disqualified him from the performance of his official duties as a general surgeon in the Navy. Furthermore, I feel that the Commissioner has erroneously interpreted the Navy regulations governing the release of officers from active duty.
Just before his entry as a surgeon in the Navy in 1943, plaintiff was employed by an insurance company for several months as a project surgeon on a construction job where he worked sixteen to twenty hours daily attending to the emergency medical requirements of approximately 6,000 to 25,000 construction employees. From this fact, one may safely conclude that, when he entered the service, plaintiff was well qualified to perform in a reasonable manner the normal duties of a general surgeon. Plaintiff then entered active duty in the Navy as a Lieutenant Commander (surgeon) and did reasonably perform his assigned surgical duties until his rectal operation in 1944.
There is no dispute that, while in service in 1944, plaintiff suffered the physical disability of partial rectal incontinence, the result of damage to the sphincter muscle of the rectum from a hemorrhoidectomy. An interpretation of this medical *554 jargon reveals that plaintiff experienced the infrequent, but unpredictable loss of control of the movement of his bowels as a result of the surgery while in the Navy. There is no dispute that plaintiff’s inability to control his bowels had a marked effect on his surgical performances; inasmuch as unpredictable exits to the bathroom forced him to suddenly interrupt the course of an operation. Furthermore, unexpected flatus during an operation made him understandably nervous. This feeling was worsened by an anxiety neurosis, the result of his constantly being worried about his bowel control.
Surely, there are few vocations in which plaintiff’s condition would be a more serious and disabling handicap than that of a general surgeon seeking to perform reasonably his normal duties. The readers of this opinion might better comprehend the severity of plaintiff’s handicap if an analogy to his plight is drawn in the legal profession. The persuasive powers of a trial attorney would be of little value if his summation to a jury was unexpectedly interrupted by his desperate dash to a bathroom. Whereas the lawyer might be able to return to the courtroom suffering only a tactical loss; the losses at stake due to the surgeon’s sudden exit would be much greater. Certainly no patient would be willing to let the success or failure of his operation be subject to the uncontrolled caprice of his surgeon’s rectal muscle.
The normal duties required of plaintiff, who entered upon active naval duty as a general surgeon, without 'physical restrictions as to type of duty, are clearly and unequivocally stated in the Navy regulations.[1] These are the duties which general surgeons could normally be called upon to perform, including the ability to perform all their duties at sea. And *555 plaintiff’s disability was to be based upon Ms capacity to so perform.
In Weiner v. United States, 148 Ct. Cl. 445 (1960), at pp. 454-455, Judge Laramore, in considering a similar Army regulation, commented upon the argument that defendant now mates in this case:
The defendant argues that plaintiff’s condition did not render him unfit for limited service and that limited service is general service within the meaning of the statutes and regulations.
However, War Department Technical Manual 12-245, October 1,1945, provides in paragraph 60a, in part:
(2) * * * [A]n officer is permanently incapacitated for active service when he becomes permanently physically or mentally incapacitated for the performance of full military duty, field as well as garrison, in both peace and war. * * * [Emphasis added]
If the Government’s contention is correct, a person could lose both legs, one arm and one eye, and still be fit for general service, because he could perform some limited-service duty. This we cannot conceive. * * *
I need to add only “or lose control of his bowels” to the other disabilities listed above in the Judge’s trenchant comment to reach the same conclusion in the present case.
The per curiam opinion of the court accepts the Trial Commissioner’s finding that plaintiff “if assigned to emergency surgical duties, would have been unable always to acquit himself in a reasonably efficient manner because of his impediment,” but that these occasions would be the exception rather than the rule and that “reason must be read into the disability standards so as to adjust the man to the situation^ [Emphasis supplied] Accordingly, the Commissioner reasoned that plaintiff might have been adjusted to the situation by assignment “to less onerous duties more commensurate with his particular skills and infirmities.” I assume that this means that if plaintiff had lost a leg, an arm, or an eye, he could be similarly adjusted to the situation. The Commissioner has read into the disability standards an interpretation which goes far beyond their reasonable meaning. What he says might be applicable to limited duty, but *556 plaintiff was never officially assigned to limited duty. This error in the Commissioner’s interpretation may have been partially induced by defendant’s singular and inaccurate reference to these established disability standards in its brief: “In substance, the criteria set forth for disability retirement is the inability to perform the officers’ duties as is necessary to reasonably fulfill the purposes of military employment.” Completely omitted by defendant is the added requirement of “ability to perform all their duties at sea and m the field.” [Emphasis added]
Reasoning that a doctor would know about his disability retirement rights, the Commissioner found it difficult to credit plaintiff’s testimony that he was ignorant of these rights. In light of plaintiff’s undisputed testimony, this is an unjustified assumption. Furthermore, this assumption is contradicted by the undisputed fact that the separation examining physicians clearly and erroneously told plaintiff that his disability “was a VA not a Navy, problem.” Tr. p. 140.
The Commissioner stated that certain inferences could be drawn from plaintiff’s delayed application to the Correction Board and his interim activities. These inferences, unfavorable to plaintiff, are not supported by the evidence, and in no way are relevant to plaintiff’s actual physical condition when he was released from active duty. Thus, these inferences are doubly faulty; they are both inaccurate and unnecessary.
After his bungled rectal operation, plaintiff was assigned duties as a general surgeon with limitations adapted to* his rectal disability. His post-release civilian practice has been likewise limited in that his condition has remained substantially unchanged since the operation. Furthermore, the Commissioner has found that “Plaintiff’s physical condition would have handicapped him in the private practice of medicine 'and surgery, but this condition would not have operated to the same extent to deter his performance as a naval surgeon on active dutyP
While in the Naval Reserve from 1946 to 1959, plaintiff’s physical activity, including several short tours of duty as a surgeon, consisted largely of “waiting for things to happen.” (Finding 18). During this period, he was given sixteen cursory physical examinations, all lacking in digital or in *557 strument examination of the rectum or anus. The Commissioner found it difficult to reconcile these abbreviated examinations with the undisputed facts as to plaintiff’s continuing disability. However, these facts as to plaintiff’s activities after his release can be readily reconciled by concluding that he was trying his best to carry on without help despite his obvious disability. This view is supported by his frank statement to the Veterans Administration in his first application for service-connected disability in 1946: “I am a doctor and do not request medical help, remuneration or anything else unless the condition should develop into a handicap in the future.” If any inferences are to be drawn from this candid statement, they are in favor of plaintiff’s position.
As a result of plaintiff’s first thorough examination since his release in 1946, the Veterans Administration, in 1959, found a ten percent disability for partial rectal incontinence and hemorrhoids, post operative. The only other complete physical by the Navy was in 1962; the result as reported to the Correction Board by the Physical Evaluation Board was:
2. Plaintiff, at the time of his release from active service, “was incapacitated for active service by reason of Rectum and anus, impairment of sphincter control constant slight with occasional moderate leakage, that his incapacity was permanent, and that such incapacity was the result of an incident of the service.”
3. Plaintiff “became patently incapacitated for active service subsequent to his appointment as an officer.” See Finding 22, p. 28.
The subsequent proceedings before the Physical Review Council, the Physical Disability Review Board, and the Correction Board merely reviewed the medical history and the additional medical evidence submitted by plaintiff without further physical examination of, or even allowing an appearance by plaintiff. The Trial Commissioner determined that these proceedings were so clearly erroneous that the Correction Board’s decision was not reviewed with the protection of the customary degree of finality or of the substantial evidence rule. Accordingly, he reviewed the administrative record, as augmented by judicially produced de novo evidence, on the basis of a preponderance of the evidence test.
*558 Accepting this approach, I find that the preponderance of the evidence in this record is strongly in favor of plaintiff, and that it establishes that when he was released from active duty, not for physical disability, he was actually suffering from a post operative injury incurred in service that prevented him from performing his normal duties as a surgeon in a reasonable manner, as construed by Navy regulations. Thus, the per curiam opinion, based upon the Commissioner’s opinion and findings, is erroneous as a matter of law in its misinterpretation of the applicable laws and regulations, and its ultimate conclusion is unsupported by, and contrary to the basic and undisputed facts found by the Commissioner.
In my opinion, plaintiff is entitled to disability retirement pay.
ColliNs, Judge, joins in the foregoing dissenting opinion.
FINDINGS op Fact
1. Birth, citizenship, residence. Plaintiff was bom April 24,1898. He is an American citizen and a resident of Syracuse, New York.
2. Early military service. Plaintiff served in the Army during World War I as a private, Student Army Training Corps, from October 22,1918 to December 9,1918. He served as a private in the National Guard of the United States and the Utah National Guard from February 2, 1920 to February 1,1921.
3. Education and employment prior to World War II service. Plaintiff graduated from the University of Maryland Medical School in 1931. He served his general internship in South Baltimore General Hospital. Following post-graduate training, including a further internship in Salt Lake City, Utah, a residency in neurology and psychiatry in Colorado Springs, Colorado, and a residency in industrial surgery and medicine in Pitcher, Oklahoma, he accepted employment in 1939 as an industrial surgeon with the Aetna Casualty and Insurance Company in New York City and, in the last several months prior to April 1943, as Aetna’s project surgeon on a construction job in Chicago furnishing first aid for accidents and injuries. In this latter capacity he worked 16 to 20 hours daily attending to the emergency *559 medical requirements of from 6,000 to 25,000 construction employees.
4. Entry on active military duty. Pursuant to official solicitation among doctors for service in the Armed Forces, on December 28, 1942, plaintiff applied for appointment in the Medical Corps, U.S. Naval Eeserve, and was found physically disqualified because of dental deficiencies, which defects were waived on March 15, 1943. On April 1, 1943, plaintiff accepted an appointment as lieutenant commander (surgeon), U.S. Naval Eeserve, was reexamined and found disqualified for dental deficiencies (waived), and no other defects noted. On April 26, 1943, plaintiff entered on extended active duty in the Navy as a lieutenant commander (surgeon), and was then in sound physical condition, although he had had occasional discomfort from external hemorrhoids and had had a hemorrhoidectomy in 1933.
5. Davisville assignment. Plaintiff was initially assigned to duty as surgeon at the Naval Construction Training Center, Davisville, Ehode Island. There he was responsible for an admission ward and a diagnostic ward of 90 beds at the Main Dispensary, supervised 11 branch dispensaries, was officer in charge of a Marine barracks, and served as instructor in advance deep sea diving training for Seabees, all of which duties he was physically capable of discharging until the occurrence of the events described in the next finding.
6. Hemorrhoidectomy. On April 11 or 12,1944, plaintiff suffered a rectal relapse (i.e., protrusion of mucous membrane through anus). On April 13,1944, he reported to the Main Dispensary for treatment, and on the following day, April 14, 1944, was operated on for the removal of protruding “large internal and external hemorrhoids” revealed by examination.
7. Oonvalescence.
(a) Plaintiff remained at the Main Dispensary until May 4,1944. On or about April 26,1944, he developed a perineal abscess on the left anal orifice, which was incised and drained of pus on that day. The abscess cavity was packed with gauze. By May 2,1944, the cavity was not completely healed and was “granulating by second intention”.
(b) On May 5,1944, plaintiff was transferred to the United States Naval Hospital, St. Albans, New York, for further *560 treatment. On entrance examination bis condition was recorded as “Essentially negative except: Perineum — 1" long granulating wound * * *. Slight drainage present.” Later a progress notation revealed “Rapid healing of wound which has a small granulating area persisting. No drainage. No complaints.” Plaintiff was returned to duty June 20, 1944. There is nothing in his medical records to indicate a physical examination was made at the time he was returned to duty.
(c) While at St. Albans from May 5, 1944 to June 20, 1944, the plaintiff spent only a few nights in the hospital, but instead lived at home and reported in weekly for a checkup. During this period he dressed his own wound with the help of his wife, who was then a registered nurse. When he returned to duty June 20,1944, plaintiff still had a granulated sore, but was free of rectal drainage of pus, serum, or blood. However, rectal incontinence (i.e., inability to control the escape of gases, liquids, or solids) had developed.
8. Post-operation tour of duty. On July 27,1944, plaintiff was examined and found to be physically fit for transfer and duty outside the continental limits of the United States and, after short assignments to two Navy Yards in the New York City area, was transferred to the United States Naval Hospital, Balboa, Canal Zone, where he remained until his return to the United States in December 1945 for relief from active duty (except for brief interim duty in the Galapagos Islands).
9. Physical examinations through 191$. In an annual physical examination on December 31,1944, and a temporary physical examination for promotion on November 14, 1945, and examinations on November 29, 1945 and December 12, 1945, for release :to inactive duty, the only defects noted in plaintiff were a slight pes planus (2nd degree), a small hemorrhoid tag on the left side, and dental defects which had been waived. He was found physically qualified to perform duties of his rank at sea or on foreign service, and physically qualified for release to inactive duty. On the occasion of the physical examinations referred to, no digital or instrumental rectal examination was made, although the plaintiff had remarked his rectal incontinence.
*561 10. Belief from aeti/oe duty. By order dated November 26, 1945, and effective January 19, 1946, plaintiff was relieved from active duty, not for physical disability, in the grade of commander (to which he had been temporarily promoted effective November 8, 1945). In the physical examination given plaintiff on December 12, 1945, in connection with his relief from active duty, it was reported that he had a hemor-rhoidectomy followed by an abscess in 1944, that he then had no hemorrhoids, and that he was found physically qualified for release to inactive duty.
11. Beetal incontinence in service. During the plaintiff’s active duty from the time of his discharge from the hospital following his operation, until his release to inactive duty in January 1946, he was assigned duties as a general surgeon, primarily with orthopedic wards. He also did some X-ray reading and consultation work. His duties involved some physical activity, but were not as strenuous as those he had performed prior to his 1944 operations, and he was generally able to discharge them, sometimes with difficulty. He endeavored to obtain assignments which would cause him the minimum amount of difficulty and embarrassment in consequence of the rectal incontinence from which he continued to suffer following his operation. During this period he experienced rectal abscesses and boils which he treated himself. He sought no medical assistance in this period. He frequently soiled his underclothing and trousers without sufficient advance warning to avoid it, and when this occurred midway in the performance of particular assignments it was disconcerting and embarrassing, for he would have to absent himself for clean-up operations.
12. Physiology of the rectal apparatus. The anal canal is the far terminal tract of the large bowel, where the bowel opens to the outside through the rectum and anus. The rectum is the lower and last part of the large bowel, and the anus, at the lower end of the rectum, is the opening to the outside. The anal canal is lined with mucous membrane nearly to the anal orifice; the skin and the mucous membrane join in the anus. Just at the end of the mucous membrane is the so-called sphincter muscle, which actually consists of an internal sphincter and an external sphincter. Both sphincters *562 go completely around the rectum; their function is to contract, or pucker, the rectum, as a drawstring tightens a laundry bag, to keep the rectum tightly closed. The external sphincter is a “voluntary” muscle, i.e., one that can be relaxed or contracted at will, while the internal sphincter, a very strong muscle, is “involuntary”, performing its function without conscious volition. The two muscles are controlled and function together, however, and damage to one will affect the other, at least indirectly.
13. Cause and continuity of rectal incontinenee. Plaintiff had prior to the termination of his active Naval service on January 19,1946, and has since had, a very relaxed external sphincter and a partially impaired internal sphincter. There is a rigid, hard, mass of scar tissue, about half an inch wide and an inch or two long, extending from the anal margin up inside the rectum, which has interrupted and partially destroyed his internal sphincter, the muscle tissue of the sphincter having been replaced by the scar tissue. The external sphincter has also been “relaxed”, or weakened, so that the rectum cannot be tightly contracted. In consequence, plaintiff has, and has had since April 1944, mild rectal incontinence. The incontinence may have been caused by surgical oversight during his first operation, by erosion from the abscess and infection plaintiff developed April 26, 1944, by damage caused in incising the abscess, or by the formation of scar tissue as a result of the abscess. Whatever the precise cause, it is clear that in direct consequence of one or both of plaintiff’s rectal operations in April 1944, he has thereafter suffered from impairment of sphincter control, with moderate rectal incontinence. The condition has remained substantially unchanged since prior to January 19, 1946; aging-might tend to decrease the amount of compensation plaintiff could make to try to control his incontinence, because of impaired muscle tone, but it would not increase the destruction of the sphincter muscle. The scar tissue responsible for the condition probably accumulated and reached its existing condition within one to two years following the operation in April 1944. There is no surgical or medical treatment for the condition that would not involve a substantial risk of *563 converting the plaintiff’s present partial incontinence into a total incontinence.
14. Physical standards. Court-Martial Order No. 12-1946 was used as a guide for retirement on account of physical disability of Naval Eeserve officers. The following passages from Court-Martial Order No. 12-1946 are applicable to the case under consideration:
Physical incapacity is defined as a condition, bodily or mental, which unfits at present, or is likely to unfit in the near future, the officer for the performance of his duties. (21 Op. Atty. Gen. 387, L.R.N.A. 598.) *****
It is to be remembered that the incapacity to discharge his duties contemplated by the statute is not an incapacity to discharge them as well as they ought, theoretically, to be discharged by officers generally of the same rank and intrusted with similar duties. The law does not say that he must be incapable of performing his duties well, but that he must be incapable of performing them at all, or, in other words, he must be unable to so perform them as to reasonably fulfill the purposes of his employment. (27 Op. Atty. Gen. 14,18; L.R.N.A. 598.)
$ $ $ $ In the regular Navy an officer may not be promoted permanently to a higher grade on the active list, with an exception not here pertinent, until he has been pronounced physically qualified to perform all his duties at sea (34 U.S.C. 271). This requirement is specifically made applicable to officers in the staff corps of the Navy (34 U.S.C. 284). In the Marine Corps permanent promotion to a higher grade may not be made until an officer is pronounced physically fit to perform all his duties at sea and in the field (34 U.S.C. 665). The general test of physical qualification for promotion is the basis upon which officers in the regular services are found to be fit for service, or to be unfit so as to warrant their cases being brought before retiring boards, without regard to the particular duties which any individual officer, in fact, may be called upon to perform. Whether or not incapacity exists in- any particular case is, of course, a matter for determination by a retiring board.
* * * when an officer of the regular service is suffering with a disease or injury of a permanent nature to a degree that incapacitates him or is likely to incapacitate him in the near future for the performance of the duties of his office, he should be retired. Incapacity apparently *564 exists under the law, when an officer’s physical condition is such, that he cannot perform Ms duties in a reasonable manner. The term “disability” as used in the Act of August 27,1940, as amended, supra, with respect to officers of the reserve forces, insofar as concerns physical retirement, means the same as the term “incapacitated for active service” as contained in Section 1453, Revised Statutes, with respect to officers in the regular service. * * *
So far as concerns general service officers of the Naval or Marine Corps Reserve who may be required to perform the same duties at sea or in the field as are required of officers in the regular services, there appears to be no basis for any distinction in determining when an officer in the regular service or such a reserve officer is incapacitated or disabled so as to be subject to physical retirement. The same standards as are applicable in determining when an officer in the regular service is physically incapacitated for regular service, aside from the question of line of duty or incident of the service, should be applied in determining when a general service officer of the Naval or Marine Corps Reserve is disabled so as to be subject to physical retirement.
$ ‡ ‡ ‡
The primary purpose of the laws governing physical retirement in the regular service is not to extend a benefit, but is the means for separating from the active list an officer who is unable because of his physical condition reasonably to perform the duties that could normally be required of him. * * * Basically, therefore, it would appear that inability to’ perform the duties which an officer could normally be called upon to perform should be the determining factor as to whether an officer should be retired.
Reserve officers in specialist categories who entered upon active duty without restriction from a physical standpoint as to where or what type of duty they might be ordered to perform, appear ito be analogous to staff officers in the regular service. In determining whether such reserve officers are disabled to an extent warranting retirement, the same standards should be applied as are applicable to staff officers in the regular service, i.e., ability to perform all their duties at sea, and in the case of Marine officers at sea and in the field.
In many cases officers are found to be suffering with diseases or injuries which are considered to unfit them for full duty but which do not prevent performance of *565 limited duty. Any such officer wbo is released from active service because no limited duty berth is available for him is within the contemplation of the law. Likewise any such officer who remains on active duty in a limited status and who eventually is released from active service is within the terms of the law even though the reason assigned for his release is that he had the necessary points. It cannot be stated with certainty that if any such officer had been found physically qualified for full duty that he would have been demobilized at the particular time. _ If physically qualified, he might have been kept on active duty beyond the date of actual demobilization. It should be presumed in such cases that his unavailability for full duty so affected his status as to constitute at least a partial basis for his release from active service at the time such release occurred, even though a different reason is assigned therefor. In this connection the intent of Congress in enacting the pertinent legislation was to give an officer who considers that he should be retired, an opportunity to test his case. It is to be presumed that retiring boards will recommend for retirement only those officers who, under the law, are entitled to retirement and who should have been retired in the first place. (File: JAG:CA:HJM:mgl, 26 Nov. 1946.)
15. Post-service civiMcm employment.
(a) After his release from active duty plaintiff returned to work for the Aetna Casualty and Surety Company in New York City as a compensation examining physician, the duties of which cannot be equated to general practice of medicine and surgery. Although the plaintiff testified that he would have preferred to enter the private practice of medicine at that time, and that his physical condition prevented him from doing so, it is problematical whether, in the absence of the physical condition, the plaintiff would have practiced medicine privately, for his prior civilian medical practice had been exclusively institutional (see finding 3, supra). Plaintiff’s physical condition would have handicapped him in the private practice of medicine and surgery, but his condition would not have operated to the same extent to deter his performance as a Naval surgeon on active duty. It may be concluded that plaintiff’s choice of returning to work for Aetna after his release from active duty was die- *566 tated more by his personal preference than by consideration of his physical shortcomings.
(b) Plaintiff remained with Aetna for about three years, and then went to work for the New York State Burean of Workmen’s Compensation as an associate compensation examining physician, which remained his occupation at the time of trial. Plaintiff’s duties since his discharge in 1946 have required little or no physical exertion and permit him complete control over his time, so that it has been easier for him to adapt his physical condition to his work than it would have been in private practice of medicine and surgery.
16. First application to VA.
(a) On February 13, 1946, the Veterans Administration received an application for service-connected disability compensation which plaintiff had filed with the Army Service Command. In the questionnaire attached to the application the plaintiff noted “perineal abscess” as the “nature of disease or injury on account of which claim is made * * On March 5, 1946, the Veterans Administration, on the basis of plaintiff’s service records and without examining plaintiff, advised plaintiff that “Service connection has not been established for the following diagnosed conditions: Perineal Abscess, not found on last examination.” On March 14,1946, the plaintiff wrote the following letter to the Veterans Administration:
For the record I am not interested in a pension now. I claim no disability now. Following recommendation of officers at separation center a report was filed for the purpose of getting a claim number should the condition give me trouble in the future.
Abscess has drained twice since August 1944. There was no abscess when I was separated but there was a small crust. There is a small crust now. I am a Dr. and do not request medical help, remuneration or anything else unless the condition should develop into a handicap in the future.
(b) On June 17, 1949, the Veterans Administration advised plaintiff that his claim for disability compensation had been reviewed on the basis of additional service records (but without a medical examination), and that it had been deter *567 mined that “service-connection should be granted for the Post-operative residuals of tbe hemorrhoidectomy performed in service, but the same is evaluated at 0% disabling and no compensation payments may be made for that condition.” An appeal was invited. The Eating Sheet upon which the notification to plaintiff was based reported “Hemorrhoids, P.O. [post-operative] cured.”
17. Second application to VA.
(a) In February 1959 the plaintiff applied to the Veterans Administration for an increase in his percentage of disability rating. On the basis of a physical examination he was awarded a 10 percent disability rating for hemorrhoids, postoperative, with partial incontinence of external anal sphincter, effective February 10, 1959. He has been so rated continuously since then.
(b) On July 14, 1959, the plaintiff appealed the decision of the Veterans Administration awarding him a 10 percent disability, and attached a statement from a private physician who reported, following a physical examination, that plaintiff had “huge internal hemorrhoids”, “prolapsing rectal mucosa”, and sphincter muscles which were “apparently intact, but are loose”. Plaintiff was also examined by a Veterans Administration physician on March 16, 1960, who reported that “To be sure there is contractility of the sphincter but it is definitely impaired so that the finger can be slid in and out of the anal canal while the veteran is contracting his sphincter to the best of his ability. Anoscopic examination reveals a rosette of moderate sized internal hemorrhoids which are neither bleeding or ulcerated.” This physician concluded that plaintiff had “partial rectal incontinence”. On August 3, 1960, the plaintiff was rated for hemorrhoids, post-operative, with partial incontinence of external anal sphincter, 10 percent from September 10, 1959, service connection by aggravation of a preexisting condition.
(c) On October 20, 1960, the Board of Veterans Appeals denied plaintiff’s appeal, finding that “a rating in excess of that presently assigned for this disability is not warranted.” A compensation check was tendered plaintiff by the Veterans Administration, but refused.
*568 18. Na/val Reserve activities. From January 19, 1916, to December 81, 1959, wben be was transferred to the Retired Reserve, plaintiff held a commission in the Naval Reserve. During this period he had a number of short tours of active duty for training. These included attendance at medical lectures and service as battalion surgeon, 2d Tank Battalion, TJ.S. Marine Corps, during two-week tours of active duty for training. Plaintiff’s physical activity while on these short tours consisted largely of “waiting for things to happen”, and he was generally able to compensate for his partial rectal incontinence. He also participated in inactive duty reserve training from about March 3,1952, to July 1,1959; his duties in this connection consisted largely of reporting to the training center for eight hours once every two weeks, and not “doing much” except waiting.
19. Naval Reserve physical examinations.
(a) From October 15,1948 to July 31, 1959, plaintiff was given 16 physical examinations in the service in connection either with his active duty training, transfer, augmentation, or promotion. Thirteen of these examinations were routine examinations finding the plaintiff to be physically qualified for tours of active duty training. Two of these 13 routine examination reports (August 1952 and August 1953) were signed by the plaintiff as examining physician, while a third, dated March 30, 1953, which was certified by plaintiff to be correct, reports as part of plaintiff’s medical history that “Piles operated on in 1943, Navy, cured, no trouble now.” In a report of medical examination performed March 3,1952, in connection with plaintiff’s transfer to the organized reserves, the medical history of which the plaintiff certified as correct, it is noted “Hemorrhoids operated with no sequelae.”, and on the basis of the examination plaintiff was found physically qualified for transfer to the organized reserves. In a report of medical examination performed May 21, 1956, in connection with plaintiff’s promotion to captain, no defects were noted related to the plaintiff’s present complaint and he was “Found to be physically qualified for promotion and to perform all duties of his rank at sea and ashore.” In a report of medical examination performed April 22,1957, for purposes of “augmentation” into the Regular Navy, the medi *569 cal bistory portion of which the plaintiff certified to he correct, it is reported (apparently in plaintiff’s handwriting) “hemorrhoidectory at age 46; hernia repair at ages 41 and 52. No hernia or hemorrhoids now.” In this same report the examining physician notes, apparently on the basis of advice furnished him by the plaintiff, “Following hemor-rhoidectomy in 1946 developed pereanal [sic] abscess, NCD [i.e., not considered disabling] with no sequelae. No recurrence of bleeding or pruritus. NCD.” In his formal application of July 2, 1957, for augmentation into the Eegular Navy, the plaintiff stated: “I am in excellent physical condition.” He was found physically qualified for augmentation, but his application was denied. In four reports of medical history the plaintiff certified his health to be good or excellent. Three of four reports of physical examination in the ten years following October 1948 reflect a normal “anus and rectum,” no defects, and that plaintiff was physically qualified.
(b) It is difficult to reconcile the contents of these medical records following plaintiff’s release from active duty with his testimony and independent evidence of his rectal condition during the same period. Beyond doubt the plaintiff’s rectal apparatus was subnormal despite the implications to the contrary in his medical records in the Naval Reserves, but it is questionable whether plaintiff’s rectal incontinence was either as severe, continuous, or uncontrollable as he contends here.
20. Application to Correction Board. On February 9, 1960, the plaintiff wrote to the Bureau of Naval Personnel to request disability retirement from the Navy for rectal prolapse, internal hemorrhoids, external hemorrhoid tags, and occasional incontinence since his operation in 1944. On February 18, 1960, he was advised by the Chief of Naval Personnel that the latter was “without authority to consider your request for disability retirement benefits” because plaintiff’s release from active duty had not been effected “by reason of physical disability pursuant to the findings of a board of medical survey, retiring board, or disposition board, and you are not eligible for a review of such release under the provisions of * * * the Servicemen’s Readjustment Act of *570 1944.” The Chief of Naval Personnel did not suggest to plaintiff that he could apply to the Board for Correction of Naval Kecords (hereafter referred to as Correction Board), but plaintiff learned of this recourse by inquiries at the Third Naval District, New York City. On February 24, 1961, plaintiff applied to the Correction Board for correction of his records to show that he was not physically fit to perform the duties of a captain in the Medical Corps of the Navy at the time he was released from active duty on January 19, 1946. The plaintiff requested an oral hearing, but stated that he did not desire to have witnesses appear in person.
21. Decision of Correction Boa/rd. On July 7, 1961, the Correction Board ruled that the plaintiff should be afforded a hearing by a physical evaluation board. The Correction Board did not refer the claim to a Physical Evaluation Board. An employee of the Correction Board prepared a brief dated August 28, 1961, which, after summarizing the evidence reviewed, concluded with a recommendation that plaintiff’s application be denied without a hearing. On September 13, 1961, the Correction Board wrote plaintiff that preliminary examination of his naval record and review of the material submitted by him failed to establish a sufficient basis for further action by the Correction Board, and stated that a subsequent review of the claim could be had on the basis of any additional evidence the plaintiff might produce to show that an error or injustice had occurred. The letter advised that the Correction Board could deny a hearing when the claimant fails to show that an entry or omission in his naval record was improper or unjust under existing standards.
22. Physical Evaluation Board appearance.
(a) At the instance of the plaintiff, and on request to the Chief of Naval Personnel by the Correction Board, the plaintiff was authorized to appear before a Physical Evaluation Board, which was instructed to determine:
1. Whether the plaintiff suffered a disability from disease or injury during his active Naval service from April 26, 1943 to January 19,1946.
2. Whether he was incapacitated for active service at the time of his release on January 19,1946.
*571 3. Wb.etb.er such incapacity was permanent.
4. Wbetber the incapacity was the result of an incident of the service.
5. Whether plaintiff became patently incapacitated for active service prior or subsequent to his appointment as an officer.
(b) On March 27,1962, plaintiff appeared before a Physical Evaluation Board convened at the United States Naval Hospital, St. Albans, New York. He was assigned naval counsel to represent him. He testified under oath that he had been operated on for rectal prolapse in April 1944; that there had been post-operative complications; that from and after April 1944 he had suffered rectal incontinence; that he had had no surgery for the condition since 1944; that he had brought his rectal condition to the attention of Navy doctors in December 1945 at the time of his examination for release from active service; and that he had had rectal incontinence, because of interruption of his sphincter action, continuously from and after 1944. He also testified to another allegedly disabling condition, namely, compressed air damage due to his deep-sea diving experience as an instructor during his service. The panel had before it the plaintiff’s medical records. After consideration of the evidence, the Physical Evaluation Board made recommended findings that—
1. Plaintiff “did suffer disability from disease, post surgical, in line of duty while employed in active Naval service between April 26,1943, and January 19,1946”.
2. Plaintiff, at the time of his release from active service, “was incapacitated for active service by reason of Eec-tum and anus, impairment of sphincter control constant slight with occasional moderate leakage, that his incapacity was permanent, and that such incapacity was the result of an incident of the service.”
3. Plaintiff “became patently incapacitated for active service subsequent to his appointment as an officer.”
In its recommendations the Physical Evaluation Board rated plaintiff’s disability at 10 percent, according to Veterans Administration Code 7332. Under applicable regulations the assignment of a percentage of disability was surplusage in *572 a disability retirement claim, where the criteria is without regard to the percentage of disability if there is permanent incapacity for active service.
23. Action by Physical Review Oowncil. The record of proceedings of the Physical Evaluation Board was forwarded to the Physical Review Council, Department of the Navy, on April 5,1982. Attached to the record of proceedings was a statement by plaintiff that he agreed with all findings of the Physical Evaluation Board except that pertaining to his percentage of disability, which he thought should be 30 percent. On April 18, 1962, the Physical Review Council expressed to the Physical Review Board and plaintiff the opinion that plaintiff “was fit for duty at the time of his release from active duty in 1945”. The opinion of the Physical Review Council did not discuss the evidence presented to the Physical Evaluation Board except to note that no significant defects had been noted on plaintiff’s physical examinations in 1945 and thereafter, and that in the meantime since his release the plaintiff had “developed weakness of the anal sphincter to some degree but this does not change the condition which existed at the time of release.”
24. Plaintiffs rebuttal to Qowicil. On April 23,1962, the plaintiff submitted a statement hi rebuttal to the opinion of the Physical Review Council, stating in part that his rectal incontinence had occurred while he was on active duty, and that there had been no change in this condition to his knowledge since his release other than “reoccurent [sic] rectal infections”. On May 3, 1962, the Physical Re mew Council advised the Board for Correction of Naval Records that, having considered plaintiff’s rebuttal to the Physical Review Council’s April 18, 1962 opinion, it did not concur in the recommended findings of the Physical Evaluation Board and adhered to its opinion that plaintiff “was fit for duty at the time of his release from active duty”.
25. Physical Disability Review Board. On June 4, 1962, the Board for Correction of Naval Records wrote to the Navy Physical Disability Review Board requesting advice as to the latter’s concurrence or nonconcurrence in the recommended findings of the Physical Evaluation Board, and enclosing the record of proceedings before the Correction *573 Board and the Physical Evaluation Board, the Physical Review Council’s letter of May 3, 1962, the plaintiff’s file and medical record jacket, and his fitness report jacket. The stated reason for the Correction Board’s request was the difference of opinion between the Physical Evaluation Board and the Physical Review Council. On October 1, 1962, the Physical Disability Review Board advised the Correction Board that it “unanimously concurs” with the position of the Physical Review Council. The Physical Disability Review Board noted that plaintiff’s physical examinations subsequent to January 19, 1946, showed him to be “physically qualified to perform the duties of his rank at sea and on foreign shore”, that the "Veterans Administration had denied plaintiff’s claim for disability benefits in 1946, and that while plaintiff may have developed since his release a weakness of the anal sphincter to some degree, this did not “operate to alter the condition which existed at the time of his release from active duty”. The Physical Disability Review Board did not examine plaintiff nor invite him to appear personally before it because “the records were voluminous and complete, the interests of the petitioner and of the Government in this case are so well protected that a full hearing with personal appearance before the Board will not be necessary”. The Physical Disability Review Board made no mention in its advisory opinion of the facts set forth in finding 18 hereof respecting the action in 1959 of the Veterans Administration awarding plaintiff service-connection for rectal incontinence.
26. Reconsideration by Correction Board.
(a) By letter of October 25, 1962, the Correction Board transmitted to plaintiff a copy of the advisory opinion of the Physical Disability Review Board, informing him that it would give him 30 days to file “such additional comment and/or documentary evidence as you may desire in rebuttal” thereto. On December 28, 1962, the Correction Board further advised plaintiff that, in view of the conflicting medical opinions in the case, all evidentiary matters would be transmitted to the Chief, Bureau of Medicine and Surgery, for further study and an advisory opinion. On the same day the Correction Board transmitted to the Chief, Bureau of Medicine and Surgery, plaintiff’s Physical Evaluation Board *574 proceedings, the Physical Eeview Council’s opinion of May 3, 1962, the Physical Disability Eeview Board’s opinion of October 1, 1962, the Correction Board’s file, plaintiff’s file, his fitness report jacket, and medical record jacket.
(b) By letter of March 20, 1963, the Bureau of Medicine and Surgery advised the Correction Board that it concurred in the opinion that plaintiff was “fit for duty at the time of his release from active duty” and recommended that plaintiff’s petition be denied. The Bureau’s letter reflected that while plaintiff’s evidence showed that he “now has some degree of rectal incontinence, * * * there is no record of incontinence, per se, until he was hospitalized in August of 1959” for certain fractures sustained in an accident. The letter was prepared by Commander John W. Flynn, who had previously participated in plaintiff’s case, in the April 18, 1962 tentative opinion of the Physical Eeview Council, where he had signed the opinion for the representative of the Bureau of Medicine and Surgery, one of three members of the said Council which recommended that plaintiff was fit for duty at the time of his release from active duty. The opinion of the Bureau of Medicine and Surgery reported itself to be based on “A review of the records”.
(c) By letter dated April 9, 1963, the Correction Board advised plaintiff that his case had been referred to the Bureau of Medicine and Surgery for an advisory opinion, and furnished him a copy of the Bureau’s opinion of March 20, 1963, referred to in the preceding paragraph of this finding. The Correction Board stated that “the preponderance of the medical opinion in your case is to the effect that you were fit for duty at the time of your release from active duty.”, and, accordingly, adhered to its original decision denying the plaintiff’s application. Without analyzing the evidence in detail, the Correction Board enumerated the various records which it had considered in reaching its conclusion that plaintiff had not established “the existence of probable error or injustice in your case.” However, the files of the Correction Board contain a detailed analysis of the medical factors in the claim prepared by a staff member of the Board, which recommends that the application be denied without a hearing. This analysis, which was presumably considered by the *575 Board, recites the plaintiff’s statement of the alleged injustice, summarizes his Naval service, and presents in adequate detail both his medical military history and additional medical evidence submitted by the plaintiff, including reports of physical examinations by two private practitioners.
27. Appeal to the Secretary.
(a) On October 17, 1963, the plaintiff forwarded to the Secretary of the Navy 45 pages of documents pertaining to his “entitlement to Naval Disability Retirement”. Included in the documentary material so transmitted were a statement of June 25, 1963, from Dr. Robert B. Bryant, and one of May 29,1963, from Dr. B. O. Murphy.
(b) Dr. Bryant examined the plaintiff in January 1961 and June 1963. In his written report of June 25,1963, after describing the plaintiff’s medical history and the results of the two examinations, Dr. Bryant reached the following conclusions:
I feel that this officer has a permanent incontinence which is a direct result of scarring of his anal region following an operation for prolapse of the rectum and internal hemorrhoids which were complicated by an abscess which necessitated incision and drainage. These surgical procedures apparently interrupted the sphincter muscle and resulted in marked scar formation so that the sphincter is now completely unable to tightly close the anus. There is no hope for improvement of this condition on conservative management instead it will gradually but very slowly worsen. The condition is extremely annoying to the patient, prevents him from working or from carrying on most normal activities, since he must be constantly mindful of the fact that he will be leaking gas, occasionally fluid and must always be near a bathroom and must change his underclothing frequently.
In his written report of January 30,1961, Dr. Bryant stated that plaintiff has “a moderately severe incontinence with internal hemorrhoids and some rectal prolapse”, and that “the condition is permanent and disabling”.
(c) Dr. Murphy examined the plaintiff in May 1963. In his written report of May 29, 1963, after reciting the plaintiff’s medical history and the results of his examination, Dr. Murphy stated that plaintiff’s sphincter was quite relaxed, *576 tbat be had a line of scar tissue which could be felt and appeared as an oblique scar through the sphincter “apparently as a result of the second operation” in 1944, that the weakness in plaintiff’s sphincter control had been present since he was operated on in 1944 and caused a “mild type of disability”, and voiced his impression that the condition was permanent, inoperable, nonprogressive, and had not changed since the second operation in 1944.
(d) Plaintiff’s application of October 17,1963, to the Secretary of the Navy was forwarded to the Correction Board along with the enclosures. On November 27,1963, the Undersecretary of the Navy advised plaintiff by letter that, after a review of the additional material submitted, the Correction Board “continues of the belief that there is insufficient evidence to warrant a finding that you were incapacitated for the performance of your duties in 1946, * * The Undersecretary then stated “In view of the foregoing, the action of the Department in releasing you to inactive duty in 1946 without physical disability retirement, and the action of the Correction Board in denying your application appear to be proper.” The letter predicated its determination on the series of occasions since November 1945 wherein the plaintiff was found by military authorities to have been physically qualified for promotion, for release, for active training duty, for transfer to the ready reserve, and for augmentation into the regular Navy, without, however, analyzing the eviden-tiary details upon which these findings were based.
28. Testimony of Dr. Bryant.
(a) Dr. Bryant, whose written report as to his examination of the plaintiff was furnished to the Correction Board for consideration (see finding 27, supra), testified at the trial of the case in this court. Dr. Bryant graduated from medical school in 1940 and was at the time of trial a general surgeon in Syracuse, New York. He served as a medical officer in the Navy from 1942 to 1946 and again from 1950 to 1951 as a resident and in practicing surgery. He was a senior resident at the Flower Fifth Avenue Hospital, New York City. He became a fellow of the American College of Surgeons in 1954 and a diplómate of the American Board of Surgery in 1956. He is also an instructor in surgery at Syracuse University *577 College of Medicine. He is familiar with Navy retiring board procedures, not as a board member, but rather as a ward doctor. The following paragraphs (b) through (d) recapitulate his testimony before the court.
(b) Dr. Bryant examined the plaintiff’s anal region in January 1961 and in June 1963. He found hard scar tissue on the right side of plaintiff’s anus, and a prolapse of rectal mucosa on straining. The scar tissue was a hard mass one-half inch wide and extending up into the rectum for an inch or more from the anal margin. Plaintiff’s sphincter muscle tone was very poor, and he was unable to contract his sphincter tightly around a probing finger. Some small internal hemorrhoids were visible. The hard scar tissue had formed a round break in the sphincter muscle and replaced the muscle in that area, or covered it up so that it was unable to contract, so as to leave a permanent canal open to the outside. The scar tissue resulted from destruction of the sphincter muscle partly from surgery in 1944 and partly from infection which developed secondary to the surgery. The infection formed an abscess along the right side of plaintiff’s rectum, which was later opened and drained. The abscess cavity filled in with scar tissue, which became covered with a thin layer of epithelium, causing at the time itching and irritation. Inability to contract the sphincter muscle causes plaintiff to be unable to control the passage of gas or liquid stool. Dr. Bryant thought that the plaintiff’s condition when he examined him in 1961 was probably slightly more severe than it had been in 1946. This was not because the area of scar tissue would have changed since 1946, but because of loss of tissue tone associated with plaintiff’s increased age which would result in a somewhat impaired contractability of muscles, so the sphincter muscle would give him more trouble at the later date, although the basis of his present trouble was in existence in 1946. The official record of the operation in 1944 reporting no sequelae is inconsistent with the known and established facts, since the opening and draining of a secondary abscess in 1944 constituted sequelae shortly following the hemorrhoidectomy, as would the formation of scar tissue.
*578 (c) Dr. Bryant testified that plaintiff’s rectal incontinence from scar tissue could be attributed to either damage to the sphincter muscle during the operation for hemorrhoids, or upon incision of the abscess, or erosion from the abscess and infection following the operation, or the formation of scar tissue in the abscess cavity. The scar tissue would have continued to form for several months following the hemor-rhoidectomy in 1944. Judging from plaintiff’s history and the physical examinations performed by Dr. Bryant in 1961 and 1963, he expressed the opinion that the plaintiff suffered from rectal incontinence at the time of his release in 1946. Surgical correction of the plaintiff’s condition is possible, but involves an unacceptable risk that the plaintiff might become completely incontinent as a result rather than be cured.
(d) In Dr. Bryant’s opinion, the plaintiff would have had a great deal of difficulty in performing some of his duties as a Naval surgeon adequately following his operation and at the time of his release, or thereafter, because he would have to interrupt his surgical duties in the operating room to repair to the bathroom, thereby reducing his effectiveness in many situations. The plaintiff’s condition would have interfered with efficient performance of plaintiff’s duties in a reasonable manner as a Naval surgeon in 1946, according to the witness.
(e) The basic conclusions as to the plaintiff’s condition stated in Dr. Bryant’s testimony at trial were contained in his written report which was considered by the Correction Board, except that the testimony amplified the details and expressed the opinion that the disabling condition existed at the time of plaintiff’s release in 1946.
29. Testimony of Dr. Murphy.
(a) Dr. Murphy, whose written report as to his examination of the plaintiff was furnished to the Correction Board for consideration (see finding 27, supra), testified at the trial of the case in this court. Dr. Murphy graduated from Syracuse University College of Medicine in 1910, and has practiced medicine and surgery for 53 years. He has never served in the armed forces, but has acquired general familiar *579 ity with the criteria for determining fitness or unfitness for duty of a Naval officer as of January 1946. The following paragraphs (b) through (d) recapitulate his testimony before the court.
(b) Dr. Murphy examined the plaintiff on May 28, 1963, for complaints of inability to control his bowels and emission of gas. The plaintiff recited to Dr. Murphy the history of the condition. Upon examination Dr. Murphy found tags on either side of plaintiff’s anus where hemorrhoids had been previously sutured and resected. Plaintiff’s anus was too relaxed; it did not pucker or contract, and provided no resistance to digital examination. Firm, hard surgical scar tissue was found at a 5 o’clock position on plaintiff’s internal sphincter muscle, about two inches in length. The scar tissue replaced plaintiff’s internal sphincter muscle tissue since the 1944 operation. Pus from the perineal abscess following plaintiff’s hemorrhoidectomy eroded the adjoining tissue and, when opened and drained, left a nondraining fistula which caused permanent weakness and incontinence of the anus. The abscess cavity was packed with gauze after the incision and draining, and by the time the pus was drained it had already damaged the sphincter and caused a fistulous tract of scar tissue. Plaintiff’s degree of incontinence cannot be expressed in terms of percentage, but he passes gas and semi-liquid stools without being aware of it. As a result the plaintiff suffers from an anxiety neurosis because he is always uncertain about his bowel control.
(c) The scar tissue became more pronounced within a year or two following plaintiff’s operation in 1944 and was probably stabilized in 1945. Plaintiff’s sphincter muscle is probably somewhat more relaxed now than at the time of his release in 1946, but the general condition is about the same. The plaintiff has become more aware of it and resigned to it. He has been advised to practice dietary control in order to prevent soft stools, and to avoid activities involving straining or lifting. Proper diet and a properly func *580 tioning digestive system will make plaintiff feel fairly comfortable with, his condition, but he will not be completely relieved. There is no surgical cure for the condition, nor would suppositories be effective.
(d) Plaintiff’s condition would be more incapacitating for a surgeon than for a general medical practitioner. As a surgeon he would not be reliable in an emergency, for he would get a nervous reaction from passing gas in the middle of an operation. He would be unable to lift patients or turn them over, or climb up and down ladders on a ship. A civilian surgeon with his condition could not perform his duties in a reasonable manner, and plaintiff was handicapped in performing his Naval duties, although he was able to go through the necessary maneuvers.
(e) The basic conclusions as to the plaintiff’s condition stated in Dr. Murphy’s testimony at trial was contained in his written report which was considered by the Correction Board, with some additional details which do not significantly alter Dr. Murphy’s written conclusion that the plaintiff’s condition has not changed since his operation in 1944, and that the weakness in plaintiff’s sphincter control, described as a “mild type of disability”, was present then and now, and will remain.
30. Conclusion. On a preponderance of the evidence in the administrative record as augmented by evidence received at the trial of this action before the court, the plaintiff has failed to establish that the physical condition from which he suffered at the time of his release from active duty in January 1946 was such as to disqualify him from the performance in a reasonable manner of his official duties as a Naval surgeon.
CONCLUSION OE LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is dismissed.

 “Basically, therefore, it would appear that inability to perform the duties which an officer could normally be called upon to perform should be the determining factor as to whether an officer should be retired.
“Reserve officers in specialist categories who entered upon active duty without restriction from a physical standpoint as to where or what type of duty they might be ordered to perform, appear to be analogous to staff officers in the regular service. In determining whether such reserve officers are disabled to an extent warranting retirement, the same standards should be applied as are applicable to staff officers in the regular service, i.e., ability to perform all their duties at sea, and in the case of Marine officers at sea and in the field.” [Emphasis added] Court Martial Order No. 12^-1946, Nov. 12, 1946.